**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | |
|---|---|
| **J.I.,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION FILE** |
| | **No. 2:20-cv-00087-SCJ** |
| **BARROW COUNTY SCHOOL SYSTEM et al,** | |
| **Defendants.** | |

**ORDER**

This matter appears before the Court on the following pending motions:

(1) the Motion for Summary Judgment (Doc. No. [113])[1] filed by Defendants

associated with the Barrow County School System (the "Barrow Defendants")[2];

---

[1]  All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

[2]  At this stage of the case, these Defendants are: (1) The Barrow County School System (the "School System"); (2) Dr. Chris McMichael, the Superintendent of the School System; (3) Principal Jennifer Martin; and (4) Assistant Principal Angela Boyd. In this Order, the Court will refer to Dr. McMichael, Principal Martin, and Assistant Principal Boyd collectively as the "individual Barrow Defendants."

(2) Plaintiff's Motion for Reconsideration (Doc. No. [127]); (3) Plaintiff's Motion for Oral Argument Regarding Plaintiff's Motion for Reconsideration (Doc. No. [128]); (4) Plaintiff's Motion for Leave to File Surreply to the Barrow Defendants' Motion for Summary Judgment (Doc. No. [145]); (5) Plaintiff's Motion for Leave to Supplement the Record (Doc. No. [149]); and (6) the Motion to Strike filed by dismissed Defendants Clayton Crowe, Keith B. Crowe, and Tonya R. Crowe (the "Crowe Defendants")[3] (Doc. No. [151]). Response and reply briefs have been filed (Doc. Nos. [130]; [131]; [142]; [144]; [146]; [153]). Having considered these motions, the Court rules as follows.

## I.     BACKGROUND

This lawsuit arose out of the alleged sexual assault of Plaintiff by another student, Clayton Crowe ("Clayton"), at Apalachee High School ("AHS"). See Doc. No. [1]. For purposes of framing the Motion for Summary Judgment and the other pending motions, the Court recites the following facts, drawn primarily

---

[3] Due to the procedural development of this case, Tonya and Keith Crowe sometimes made filings without their son, Clayton. E.g., Doc. No. [22]. For ease of reference, the Court will often refer to any grouping of these individuals as the "Crowe Defendants."

from Defendants' Statement of Material Facts (Doc. No. [113-2]) ("DSOMF") and

Plaintiff's Statement of Additional Material Facts (Doc. No. [132]) ("PSOAMF").[4]

During the 2016–2017 school year, Plaintiff and Clayton were students at

AHS. See DSOMF ¶¶ 12–13. Plaintiff was born August 11, 1999. Doc. No. [118]

(Plaintiff Dep. Tr.), Tr. 12:12–13. Plaintiff was adopted. Id. Tr. 13:6–8.[5] Plaintiff

had a learning disability and received educational services through an

Individualized Educational Plan ("IEP"), which involved annual meetings with

a team of AHS faculty and staff, including counselors, teachers, and a

psychologist. PSOAMF ¶¶ 26–28. Prior to October 7, 2016, Plaintiff's mother had

not expressed any concerns to AHS regarding Plaintiff's safety. DSOMF ¶ 51.

Clayton's mother, Tonya Crowe, had been employed as a special education

teacher at AHS since 2000 and would continue in that role until 2021. DSOMF

---

[4] The Court also relied on other factual submissions (Doc. Nos. [133]; [143]) and the record. Pursuant to Local Rule 56.1(B), when a fact is material and undisputed, the Court includes the fact. For disputed facts, the Court reviews the record to determine if a material dispute exists. Where the other party's response reflects the record cited more accurately, the Court modifies the proposed fact and cites the record. The Court also rules on objections to proposed facts and excludes immaterial facts, those stated as an issue or legal conclusion, those not supported by a citation to evidence, or those that the record citation fails to support. Finally, where appropriate, the Court includes facts drawn from its review of the record.

[5] Unless otherwise noted, when the Court refers to Plaintiff's "mother" in this Order, the Court is referring to Plaintiff's adoptive mother, Gail Isaacs.

¶ 52. By around December of 2014, Mrs. Crowe and her husband, Keith Crowe, had learned of allegations that Clayton had engaged in sexual misconduct against his female cousin during off-campus interactions. DSOMF ¶ 53. Clayton's parents did not believe that these allegations were true, and Clayton would not be indicted in connection with these allegations until 2019. DSOMF ¶¶ 54, 59. Mrs. Crowe testified that she did not inform any administrator at AHS about the allegations against her son. DSOMF ¶ 55.[6] Clayton's AHS discipline records do not reflect any sexual offense prior to October 7, 2016. See Doc. No. [123] (Gail Isaacs Dep.), Dep. Tr. 148:19–150:7.

On October 7, 2016, AHS held an outdoor, field-day event called "Chee Fest" as a reward for students. DSOMF ¶ 7. Chee Fest encompassed various areas of the AHS school grounds, with games organized in the gym and on sports

_____

[6] Plaintiff contests this fact by citing to a Barrow County Sheriff's Office Incident Report stating that Mrs. Crowe, "who is believed to work at her juvenile son's school[,] spoke with the administrators at her son's high school." Doc. No. [136-2], 2. The report does not clarify, however, what exactly Mrs. Crowe told administrators at AHS. Thus, without further support or clarification, the Court does not find that this evidence contradicts Mrs. Crowe's statement. Also, this incident report states that "an unknown source at the juvenile male's school" had informed the presiding case manager about the alleged assault (id. at 2), but the unknown identity of this informant makes it unclear whether any AHS administrator would have known about the allegations.

fields. PSOAMF ¶ 20. The school's Positive Behavior Intervention Support ("PBIS") Committee organized the event. DSOMF ¶ 7.

On the day of Chee Fest, AHS Principal Jennifer Martin informed a school resource officer ("SRO") where she wanted him to be positioned during the event. See DSOMF ¶ 9. The SRO, however, had the authority to determine where he would position himself. DSOMF ¶ 9. Further, faculty and staff—including eighty-two teachers—volunteered to help oversee Chee Fest. PSOAMF ¶ 23. The PBIS Committee created a sign-up sheet so that these volunteers could select their preferred posts and positions for the event. DSOMF ¶ 10; PSOAMF ¶ 12. Ultimately, however, Principal Martin and the PBIS Committee reviewed the sign-up sheet and reassigned certain volunteer positions. See DSOMF ¶ 10; PSOAMF ¶ 13. Principal Martin created and shared with volunteers a document that identified volunteers' duties and responsibilities during Chee Fest. PSOAMF ¶ 15. Volunteers were placed at "safety posts," "expert posts," and "roving posts." DSOMF ¶ 11; see also PSOAMF ¶¶ 14, 19 (stating that volunteers with loud voices and a strong physical presence were assigned to certain safety posts).

At one point during Chee Fest, Principal Martin was roving and observing the school's track and its nearby bleachers with Assistant Principal Angela Boyd.

5

DSOMF ¶ 12. Around this time, Principal Martin received a phone call from a volunteer, who said she and other volunteers had "found two students having sex" behind the baseball field and that they "ha[d] the two students." DSOMF ¶ 12. The two students were Plaintiff and Clayton. See DSOMF ¶ 13. It is not disputed that the two students had their pants down and that Plaintiff was on top of Clayton when they were discovered. See DSOMF ¶ 13; see also Doc. No. [133], ¶ 13 (Plaintiff stating that Clayton had pulled her on top of him). Principal Martin and Assistant Principal Boyd went to intercept the group of teachers, Plaintiff, and Clayton on their way to the school's main office. DSOMF ¶ 14.

At this time, Principal Martin began gathering information concerning the incident by talking with the teachers who witnessed the incident, as well as other students who had been in the area. DSOMF ¶ 15. Clayton wrote a statement about the incident, which he revised at Principal Martin's direction because his first draft was only one sentence long. DSOMF ¶ 17; Doc. No. [120] (Martin Dep. Tr.), Tr. 104:24–106:1. Meanwhile, school counselor Amy Bishop transcribed Plaintiff's account of the incident because Plaintiff was "really upset and was having trouble focusing." DSOMF ¶ 17; Martin Dep. Tr. 104:4–14. As Plaintiff gave this statement, she told Ms. Bishop that Clayton had raped her. See DSOMF

¶ 19; Plaintiff Dep. Tr. 169:8–14. Principal Martin prepared her own statement and obtained statements from the volunteers who had encountered Plaintiff and Clayton. DSOMF ¶ 18.

At some point after the incident occurred, Plaintiff's mother came to the school, likely after an administrator asked her to do so. See DSOMF ¶ 16; see also Doc. No. [115] (Boyd Dep. Tr.), Tr. 120:10–16, 161:19–163:14; 183:1–5. Clayton's mother arrived to the office at some point after Clayton wrote his statement. See Martin Dep. Tr. 104:19–105:5.

Following her preliminary investigation of the incident, Principal Martin concluded that Plaintiff had willingly decided to meet Clayton behind the baseball field during Chee Fest. DSOMF ¶ 20. Principal Martin assigned both students to two days of out-of-school suspension for being "out of assigned area" during Chee Fest. DSOMF ¶ 21. Under the terms of the suspension, Plaintiff was allowed to return to school on October 19, 2016, but she did not return at that time because she was uncomfortable going back to school. DSOMF ¶ 22; cf. Doc. No. [134] (Bishop Dep. Tr.), Tr. 113:5–9 (stating that she believed Plaintiff was assigned to homebound instruction through December of 2016 because she was "uncomfortable coming back to school"). Clayton, on the other hand, was not

allowed to return to AHS. DSOMF ¶ 23; see also Doc. No. [121] (Greene Dep. Tr.), Tr. 200:19–202:13 (stating that Clayton was not allowed to return to AHS to complete the school year or participate in extracurricular activities).

On October 17, 2016—the first school day after the incident—Principal Martin sent the school counselor, Ms. Bishop, to Plaintiff's residence for a welfare check and to deliver Plaintiff's school assignments. DSOMF ¶¶ 33, 36; Bishop Dep. Tr. 78:6–82:4, 188:2–189:2. Around this time, AHS officials understood that Plaintiff was not comfortable returning to school. DSOMF ¶ 35. Thus, according to Principal Martin, school assignments continued to be sent to Plaintiff as she undertook at-home schooling. Martin Dep. Tr. 118:15–20.[7] As Ms. Bishop made these welfare visits as a school counselor, Principal Martin understood that Plaintiff was receiving counseling through a third party regarding the incident and thus did not offer further counseling services beyond Ms. Bishop's visits. See DSOMF ¶¶ 37–38. Plaintiff continued to receive weekly third-party counseling services for a year after the incident. DSOMF ¶ 38.

_____

[7] Although Ms. Bishop testified in her deposition as to just two home visits, Principal Martin testified in her deposition that assignments "continued" to be sent to Plaintiff. Bishop Dep. Tr. 78:6–82:4; Martin Dep. Tr. 118:15–20.

In exploring options for Plaintiff to return to in-person schooling, Plaintiff's mother asked the School System's Superintendent to help get Plaintiff enrolled in a high school in Gwinnett County because she did not want Plaintiff to return to AHS or enroll at Winder-Barrow High School, the only other traditional high school in Barrow County. DSOMF ¶¶ 40, 42. The School System and its officials have no authority to enroll a student in a Gwinnett County public school. DSOMF ¶ 41. Plaintiff's mother also inquired about accommodations if Plaintiff were to return to AHS, such as "extra tutoring" and smaller class sizes. See G. Isaacs Dep. Tr. 152:23–164:25.[8] On October 25, 2016, after Plaintiff had expressed a preference for home-based educational services, an annual IEP meeting was held regarding the classes Plaintiff was taking and the services she was receiving. See DSOMF ¶ 43; Bishop Dep. Tr. 106:7–117:6. For the remainder of that school year, the School System continued to provide home-based educational services to Plaintiff, who appreciated that her teachers had been meeting with her at home, liked her math teacher, and felt like she was making

---

[8] Plaintiff's mother indicated that these requested accommodations were denied. G. Isaacs Dep. Tr. 152:23–25, 164:21–24. Plaintiff's mother separately indicated that she had not requested accommodations that Defendants had denied, but she clarified that these requests had been made and denied. See, e.g., id. Tr. 151:17–155:9.

progress. DSOMF ¶¶ 46–47. Plaintiff later returned to AHS for her senior year at the suggestion of her psychiatrist. DSOMF ¶ 49.

During the 2016–2017 school year, AHS and the School System had policies in effect concerning security, student safety, and sexual harassment, including policies concerning assault, battery, and sexual assault. DSOMF ¶ 1. The AHS handbook and code of student conduct, provided to both students and teachers, stated that sexual harassment and sexual assault were prohibited. DSOMF ¶ 2; PSOAMF ¶ 1.[9] Dr. Kenneth Greene, Title IX investigator for the School System, testified that the School System regularly evaluates data related to school safety and develops programming and training based off that data. See DSOMF ¶ 3; see also Greene Dep. Tr. 46:2–49:23 (stating that although the School System did not have safety training exclusive to sexual assaults or harassment on school campuses, administrators did discuss those topics at leadership meetings and during "broader" trainings concerning student safety). School administrators receive annual training related to Title IX, as well as student conduct and

---

[9]  While the record contains evidence that School System employees must report instances of sexual abuse (Boyd Dep. Tr. 149:14–23), Dr. Greene clarified during his deposition that employees are "not required to report student on student allegations off campus" (Greene Dep. Tr. 230:11–22).

discipline. See DSOMF ¶ 4. This training includes a review of procedures on how administrators would collect information during an initial investigation of a complaint of sexual assault. DSOMF ¶ 5. Dr. Greene disseminated information related to Title IX and ensured that schools in the School System knew about their obligations under Title IX. See DSOMF ¶ 6.

Principal Martin knew that she was to report any Title IX violation at AHS to Dr. Greene. DSOMF ¶ 25. Principal Martin reported the incident involving Plaintiff and Clayton to Dr. Greene. DSOMF ¶ 26.[10] Dr. Greene was responsible for the School System's Title IX investigation of this incident. DSOMF ¶ 27. He started the investigation within two weeks of the incident, and he maintained a file regarding the investigation. DSOMF ¶ 28. During his inquiry, Dr. Greene observed forensic interviews undertaken by the Barrow County Sheriff's Department, conducted his own interviews, reviewed evidence submitted by Principal Martin, and documented investigative actions in his investigation file. DSOMF ¶¶ 28–29. Dr. Greene completed his investigation and prepared a Notice of Findings on November 15, 2016. DSOMF ¶ 30. Dr. Greene concluded that

---

[10] Principal Martin also directed the AHS SRO to contact the Barrow County Sheriff's Office concerning the incident. DSOMF ¶ 26.

Plaintiff and Clayton "willingly went behind the baseball stadium, and that there was sexual activity, and it was unwelcomed [and] unwanted [by Plaintiff]." DSOMF ¶ 31; Greene Dep. Tr. 131:1–5. After applying a "preponderance of the evidence" standard, Dr. Greene concluded that Plaintiff did not intend or consent to having intercourse with Clayton. DSOMF ¶ 32; Greene Dep. Tr. 202:14–203:1.

Plaintiff turned eighteen years old on August 11, 2017—she was seventeen years old when the incident occurred and twenty years old when this lawsuit was filed. See Plaintiff Dep. Tr. 12:12–13. Prior to the incident, Plaintiff enjoyed dancing at church, participating in Girl Scouts, and shopping with her mom, all activities Plaintiff stated she was unable to undertake her senior year of high school. Id. Tr. 231:4–234:7. Plaintiff later returned to some of these activities. See, e.g., Id. Tr. 232:3–233:22 (testifying that she later resumed going to church and dancing for a time). Plaintiff could not recall other extracurricular activities she stopped after the incident. Id. Tr. 234:5–7. Sometime before her senior year of high school, she reconnected with her biological family and kept in touch with them throughout that school year.[11] Id. Tr. 230:9–20. Since high school, Plaintiff

---

[11] Plaintiff first learned she was adopted when she was fourteen years old. G. Isaacs Dep. Tr. 257:25–258:24.

has maintained multiple social media accounts on various platforms, including multiple accounts on Instagram. Id. Tr. 65:22–94:19; see also G. Isaacs Dep. Tr. 230:23–231:21, 249:11–250:10 (discussing one of Plaintiff's social media accounts). In discussing her social media accounts, Plaintiff also testified as to friendships and other personal relationships she has developed or maintained since the sexual assault. Plaintiff Dep. Tr. 74:20–75:12, 79:2–85:6, 89:16–90:10.[12]

In 2017, Plaintiff worked as a teacher's assistant at a local daycare for about three months until October of 2017, when she resigned so she could focus on school. DSOMF ¶¶ 63–64. Plaintiff was eighteen years old when she worked at the daycare. See Plaintiff Dep. Tr. 58:3–11. Plaintiff testified that she kept track of her schedule when she worked at the daycare "[b]ecause it was an everyday job." Id. Tr. 219:18–20.

Plaintiff returned to AHS for her senior year during the 2017–2018 academic year. DSOMF ¶ 65. In May of 2018, Plaintiff graduated from AHS. DSOMF ¶ 66. Plaintiff testified that she generally received "A's, B's, [and]

---

[12]  Plaintiff also testified that she more recently revoked her mother's access from her social media accounts and phone because she did not "need [her] mom watching what [she does] every minute or every second of the day" and because she was becoming more independent from her mother. Plaintiff Dep. Tr. 93:8–24, 94:20–95:6.

sometimes C's" in her classes, including A's in math throughout high school. Plaintiff Dep. Tr. 46:2–20.[13] After high school, Plaintiff attended Lanier Technical College for about a year—from August of 2018 to May of 2019. DSOMF ¶ 71. She went to college because she wanted to be a teacher, and she was studying early childhood education. Plaintiff Dep. Tr. 48:3–4. She ultimately withdrew due to the workload and because it was difficult for her to "stay on track." DSOMF ¶¶ 72–73. During her deposition, Plaintiff could not recall why it was difficult for her to stay on track. Plaintiff Dep. Tr. 48:9–11. Further, Plaintiff indicated that the college was not aware of her learning disabilities and did not provide support or accommodations for those disabilities. Plaintiff Dep. Tr. 49:1–50:21.

Plaintiff also worked at Taco Bell for about a year after graduating from AHS. DSOMF ¶ 68. Plaintiff's mother helped Plaintiff fill out the job application for this position. Plaintiff Dep. Tr. 216:13–18. Plaintiff completed an interview

---

[13] Plaintiff attempts to contest this fact by citing to Ms. Bishop's deposition and stating that Plaintiff was failing classes during her senior year. Doc. No. [133], ¶ 67. The cited testimony does not support Plaintiff's statement. Ms. Bishop testified that she does not recall whether she accessed Plaintiff's grades, and she could not state with certainty that she had mailed Plaintiff's home regarding failing grades; instead, she stated only that there was a "notation" in Plaintiff's IEP record, and that a notation "was typically about grades" or when a student "was failing a class." Bishop Dep. Tr. 94:9–96:11. The Court finds that this evidence does not rebut the Barrow Defendants' citation to evidence.

14

before receiving the position. Plaintiff Dep. Tr. 216:19–21. Plaintiff kept track of her own work schedule, which changed weekly, by taking pictures of her work calendars. Plaintiff Dep. Tr. 219:21–220:4. Plaintiff stopped working at Taco Bell because co-workers repeatedly asked her for money. DSOMF ¶ 70.

In November of 2019, after Plaintiff resigned from Taco Bell, she began working as a teacher's assistant at a daycare called Child Network. DSOMF ¶ 73. In this position, Plaintiff changed diapers, wiped noses, got children ready to go outside, and helped prepare children for lunch and naptime. DSOMF ¶ 74. She maintained this position for almost a year until March of 2020, when the COVID-19 pandemic began. DSOMF ¶ 75.

Dr. Lawanda Harmon, a licensed psychologist, developed clinical opinions concerning Plaintiff's mental capacity after treating and observing Plaintiff and reviewing Plaintiff's prior medical records. Doc. No. [1-2], ¶¶ 1, 6–14. In her affidavit, Dr. Harmon states that she has personally served as Plaintiff's therapist since 2019, during which time she has treated Plaintiff "for trauma, among other things," associated with the sexual assault. Id. ¶ 7. Based on her evaluations, Dr. Harmon has determined that because of the incident, Plaintiff suffers from Depression, Posttraumatic Stress Disorder ("PTSD"), an increased level of

Histrionic Personality Disorder, and increased symptoms from her pre-existing Attention-Deficit/Hyperactivity Disorder ("ADHD"). Id. ¶¶ 9–11. Dr. Harmon opines [14] that Plaintiff suffers from a high level of fear, which has left her codependent on her mother for self-care and has affected her ability to manage the ordinary affairs of her life. Id. ¶¶ 11, 13–14. Dr. Harmon states that Plaintiff's failure to bathe or take daily medications without prompting, and her inability to manage her financial affairs independently, are examples of her incapacity. Id. ¶ 11. Further, Dr. Harmon opines that Plaintiff is "unable to think in a manner" that would allow her to "manage her life in a more constructive, consistent manner." Id. ¶ 12. In sum, Dr. Harmon opines that since and because of the incident, Plaintiff has been "mentally and physically incapable of managing the ordinary affairs of her life" and unable to reside on her own. Id. ¶ 14.

Similarly, Plaintiff's mother testified that Plaintiff is no longer "motivated" [15] to undertake certain tasks that she used to do, such as going to the mall, making her bed, cooking, and "keeping her own personal hygiene together

---

[14]  The docket does not indicate that Dr. Harmon is being presented as an expert witness, but the Court will consider her affidavit for present purposes.

[15]  When asked whether Plaintiff was "capable of doing" these tasks, Plaintiff's mother clarified that Plaintiff was not "motivated" to do them. Gail Isaacs Dep. Tr. 190:5–8.

. . . . [and] appearance up." Gail Isaacs Dep. Tr. 189:19–190:4. Plaintiff's mother also stated that Plaintiff "doesn't have any friends." Id. Tr. 190:2. She stated that Plaintiff was not doing "the things . . . to be as independent as possible." Id. Tr. 190:14–20. She testified that Plaintiff suffers from PTSD and anxiety and is "unable to care for herself." Id. Tr. 196:13–15. However, she also stated that Plaintiff had switched bank accounts from one with her mother as a joint owner to an individual bank account because she did not want her mother to be informed about her finances. Id. Tr. 197:11–18.

Plaintiff filed this lawsuit on March 27, 2020, asserting several claims stemming from the sexual assault. Doc. No. [1]. The Barrow Defendants answered on July 7, 2020. Doc. No. [9]. The Crowe Defendants moved for an extension of time to file their answer (Doc. No. [22]), which the Court granted (Doc. No. [23]). Before the Crowe Defendants filed an answer to the initial complaint, Plaintiff and her mother attempted to file an amended complaint. See Doc. Nos. [27]; [28].[16] As a result, the Crowe Defendants answered the amended complaint. Doc. No. [34].

---

[16] Plaintiff would later file a motion for leave to amend complaint, which was intended to apply retroactively to the already-filed amended complaint. Doc. No. [39].

17

The Barrow Defendants and Crowe Defendants separately moved for partial judgment on the pleadings. Doc. Nos. [37]; [51]. Briefing on those matters ensued. Doc. Nos. [41]; [45]; [54]; [56]. Before ruling on those dispositive motions, the Court denied Plaintiff's retroactive motion to amend (Doc. Nos. [39]; [108]), which made the original Complaint Plaintiff's operative pleading. Thereafter, the Court ruled on the motions for partial judgment on the pleadings, granting the motion by the Crowe Defendants and granting in part and denying in part the motion by the Barrow Defendants. Doc. No. [109]. This ruling resulted in several parties and counts being dismissed from this action. Id.

Plaintiff later moved for reconsideration of this Court's order regarding the motions for judgment on the pleadings. Doc. No. [127]. Plaintiff also moved for oral argument on the Motion for Reconsideration. Doc. No. [128]. The Motion for Reconsideration is opposed (Doc. No. [130]), and Plaintiff replied in further support (Doc. No. [142]). In a related motion, Plaintiff later sought to supplement the record with documents relating to Clayton's January 6, 2022, guilty plea relating to charges stemming from the sexual assault of Plaintiff. Doc. No. [149]. In response, the Crowe Defendants moved to strike or, alternatively, responded to Plaintiff's Motion to Supplement. Doc. No. [151].

18

Also, the remaining Barrow Defendants have filed a Motion for Summary Judgment. Doc. No. [113]. After response and reply briefs were submitted (Doc. Nos. [130]; [131]; [142]), Plaintiff moved for leave to file a surreply (Doc. No. [145]). Plaintiff's motion is opposed. Doc. No. [146].

The Court discusses the specific arguments as to these matters in greater depth below. These matters are ripe for review, and the Court rules as follows.

## II.   MOTION FOR SUMMARY JUDGMENT LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co.,

357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court should resolve all reasonable doubts in the non-movant's favor. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court must "avoid weighing conflicting evidence or making credibility determinations." Stewart v. Booker T. Washington Ins., 232 F.3d 844, 848 (11th Cir. 2000). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine dispute for trial. Fitzpatrick, 2 F.3d at 1115 (citations omitted).

## III.   ANALYSIS

The Court now addresses the pending motions. First, the Court will analyze the remaining Barrow Defendants' Motion for Summary Judgment.

### A.   **Motion for Summary Judgment**

The remaining Barrow Defendants have moved for summary judgment on all remaining claims. Doc. No. [113]. They argue that the claims are time barred and that Plaintiff has failed to identify facts from which a reasonable jury could conclude that the Barrow Defendants were deliberately indifferent to known acts of harassment or discrimination in its programs or activities. Doc. No. [113-1], 2. The Court addresses each argument separately below.[17]

_____

[17] Before getting to the substance of the parties' arguments, however, the Court briefly addresses Plaintiff's points regarding the Barrow Defendants' late summary judgment motion. First, Plaintiff styles her filing as both a response brief and a motion to strike the Barrow Defendants' motion. Doc. No. [131], 1. That request for relief is due to be denied on procedural grounds because it is improper to file a motion imbedded within a response brief. See Shenzhen Shenchuang Elect. Appliance Co., Ltd. v. HauteHouse, LLC, No. 1:18-CV-05337-SCJ, 2021 WL 5029295, at *2 (N.D. Ga. Aug. 24, 2021); see also Posner v. Essex Ins. Co., Ltd., 178 F.3d 1209, 1222 (11th Cir. 1999) (stating that when a request for relief is imbedded within an opposition filing, "the issue has not been raised properly"). Further, the Court disagrees with Plaintiff's accusations that the Court has acted unfairly by denying Plaintiff's late motion to amend her complaint earlier in this case yet allowing the Barrow Defendants to proceed with their late summary judgment motion. To start, the Court denied Plaintiff's earlier motion not only because it was late and retroactive but also because the added claims failed on the merits under a futility standard. Also, the Court's decision to deny Plaintiff's motion to amend followed a

### 1.    The Statute of Limitations Bars Plaintiff's Claims

In her Complaint, Plaintiff alleged that the statute of limitations had been tolled under Georgia law because she was a minor at the time of the assault and suffered from a mental incapacity that resulted from the assault and prevented her from managing the ordinary affairs of her life. Doc. No. [1], ¶ 12 (citing O.C.G.A. § 9-3-90).

In their summary judgment motion, the Barrow Defendants argue that Plaintiff's claims are time barred because (1) Plaintiff filed the Complaint after the statute of limitations passed, and (2) Plaintiff has not identified evidence from which a reasonable jury could find that she could not manage the ordinary affairs of life sufficient to prove incapacity and thus toll the statute of limitations. Doc. No. [113-1], 9–12. First, the Barrow Defendants contend that the statute of

---

budding record of tardiness by Plaintiff. For instance, the record shows that service was late on several Defendants. See, e.g., Doc. Nos. [15]; [16]. Indeed, even at this late stage in the litigation, it is not clear to the Court that the record reflects service on the School System. On the other hand, the Court noted in its Order admonishing the Barrow Defendants for their late motion that they had not run afoul of the relevant rules during this litigation. Doc. No. [124]. Accordingly, the Court finds that the two circumstances were distinguishable and do not reflect unfairness. Also, having considered the Barrow Defendants' reason for delay (Doc. No. [144], 1–3), the Court will exercise its discretion and consider the summary judgment motion. Rutledge v. Millsap, No. 4:12-CV-0146-HLM, 2015 WL 12866455, at *1 (N.D. Ga. July 30, 2015) (exercising discretion to consider late summary judgment motion).

limitations for Plaintiff's Title IX and Section 1983 claims ran on August 11, 2019—two years from when she reached the age of majority on August 11, 2017. Id. at 10. Because Plaintiff filed this lawsuit on March 27, 2020, the Barrow Defendants argue, she sued after the limitations period ended. Id. The Barrow Defendants reject Plaintiff's theory that the statute of limitations should be tolled due to her mental incapacity. Id. at 10–11. They argue that Plaintiff does not carry her burden to show incompetency because she has shown only decreased motivation and lack of interest in certain activities. Id. at 11. They further argue that the record shows that she maintained the ordinary affairs of life, including attending school, maintaining employment, and establishing social connections. Id. at 11. The Barrow Defendants emphasize Plaintiff's post-secondary education, as well as her employment at day care centers and at a fast-food restaurant, where she was able to keep track of her work schedule. Id. at 11–12. They contend that the record shows that she has managed her affairs and "functioned at a level that far exceeds any . . . measure of incapacity [that] would merit tolling the statute of limitations." Id. at 12. Thus, the Barrow Defendants argue, "there is no material question of fact as to Plaintiff's competency," and the running of the statute of limitations bars Plaintiff's claims. See id.

Plaintiff responds that she has presented enough evidence of incapacity to survive summary judgment. Doc. No. [131], 8–13. She contends that this issue presents a question of fact that should be determined by a jury. Id. at 10. She also argues that she can have suffered mental incapacity sufficient to toll the statute of limitations even though she was employed, attended secondary schooling, and maintained social media accounts. Id. Plaintiff refers to Dr. Harmon's report and her own deposition testimony to support her argument that a jury reasonably could find that she suffered a mental incapacity sufficient to toll the statute of limitations. Id. at 10–11. Specifically, she notes that she has suffered from certain mental illnesses, has a high level of fear, and has relied heavily on her mother to perform everyday functions. Id.

In reply, the Barrow Defendants argue that Plaintiff's evidence does not support her theory. Doc. No. [144], 3–5. For example, they contend that Plaintiff's testimony contradicts Dr. Harmon's affidavit. Id. at 3. And they argue that even Dr. Harmon's affidavit cannot carry Plaintiff's theory because it shows only that Plaintiff suffers from depression, PTSD, and similar mental conditions that are insufficient to toll the statute of limitations. Id. at 3–4. The Barrow Defendants reiterate that Plaintiff graduated from high school, maintained employment,

attended post-secondary education, and achieved other milestones that show she was able to manage the ordinary affairs of life. See id. at 4–5.

Under Georgia law, "[i]ndividuals who are legally incompetent because of intellectual disability or mental illness, who are such when the cause of action accrues, shall be entitled to the same time after their disability is removed to bring an action as is prescribed for other persons." O.C.G.A. § 9-3-90(a). Similarly, if any person suffers such a disability "*after* his right of action has accrued and the disability is not voluntarily caused or undertaken by the person claiming the benefit thereof, the limitation applicable to his cause of action shall cease to operate during the continuance of the disability." Id. § 9-3-91 (emphasis added).

When considering this issue, courts determine whether the individual was so mentally incapacitated that she could not manage the ordinary affairs of life. See Walker v. Brannan, 243 Ga. App. 235, 236–37, 533 S.E.2d 129, 130 (2000); see also Curlee v. Mock Enters., 173 Ga. App. 594, 599, 327 S.E.2d 736, 742 (1985) (attempting to discern whether the plaintiff had painted "a self-portrait of one who has merely failed to take control of or simply mismanaged the ordinary affairs of life rather than of an individual lacking in the capacity to manage his own affairs"). One claiming incapacity "need not be so mentally incompetent that

25

she requires confinement or a guardian," but she must be so "mentally deficient" or unsound in mind that she is incapacitated "from managing the ordinary business of life." Martin v. Herrington Mill, LP, 316 Ga. App. 696, 698, 730 S.E.2d 164, 166 (2012). In determining whether to toll the statute of limitations, the trial court should determine whether "it is not fair to charge a suitor with the running of the clock, because of [her] mental condition." Id. (citation omitted).

In evaluating mental incapacity, courts may rely on testimony or affidavit statements from individuals such as psychiatrists, therapists, social workers, or even the plaintiff herself describing the plaintiff's mental unsoundness. Meyer v. Gwinnett Cnty., 716 F. App'x 857, 861–62 (11th Cir. 2017) (citations omitted). Such testimony, however, may be rebutted by testimony to the contrary. Id. at 862. Courts routinely have found that suffering from conditions such as depression, personality disorder, and PTSD is not enough on its own to show the level of mental incapacity required to toll the statute of limitations; instead, there must be additional evidence that the individual was incapacitated from managing the ordinary business of life. Carter v. Glenn, 243 Ga. App. 544, 549, 533 S.E.2d 109, 115 (2000), disapproved of on other grounds by Dep't of Pub. Safety v. Ragsdale,

26

308 Ga. 210, 839 S.E.2d 541 (2020); <u>Alpharetta First United Methodist Church v. Stewart</u>, 221 Ga. App. 748, 751–52, 472 S.E.2d 532, 535 (1996).

Although the question of mental incapacity is "[o]rdinarily . . . one of fact to be determined by the jury," a "court may decide the issue as a matter of law if no genuine issues of material fact exist in the record." <u>Meyer</u>, 716 F. App'x at 861 (citations omitted). The Court of Appeals of Georgia has reiterated that "[t]he determination of whether one is mentally incapacitated within the meaning of the tolling statute can be made by the trial court as a matter of law." <u>Anglin v. Harris</u>, 244 Ga. App. 140, 144, 534 S.E.2d 874, 879 (2000); <u>see also</u> <u>Martin</u>, 316 Ga. App. at 698, 730 S.E.2d at 166 (same). "The plaintiff bears the burden of proving mental incapacity." <u>Meyer</u>, 716 F. App'x at 861 (citations omitted).

The caselaw on this issue makes clear that even if a plaintiff presents some evidence supporting a finding of mental incapacity, a court may rule against the plaintiff at summary judgment if the evidence falls short of establishing that the plaintiff was incapacitated from managing the ordinary affairs of life. <u>See, e.g.</u>, <u>Thompson v. Corr. Corp. of Am.</u>, 485 F. App'x 345, 348–49 (11th Cir. 2012) (declining to toll statute of limitations when the plaintiff's mental health issues were controlled by medication, which allowed the plaintiff "to manage the

27

ordinary affairs of his life," and the record did not otherwise show that the plaintiff was unable to manage the ordinary affairs of life). For example, the Court of Appeals of Georgia has held that evidence of a plaintiff's mental illnesses is insufficient to toll the statute of limitations when the record does not show that the plaintiff "was incapable of carrying out her day-to-day life activities and making decisions." Charter Peachford Behav. Health Sys. v. Kohout, 233 Ga. App. 452, 460–61, 504 S.E.2d 514, 524 (1998); see also Carter, 243 Ga. App. at 549, 533 S.E.2d at 115 (finding that a plaintiff was not mentally incapacitated for purposes of O.C.G.A. § 9-3-90(a), even though the record contained a psychiatrist's affidavit stating that the plaintiff suffered from PTSD and "clinically significant distress in both her social and occupational areas of functioning," because the plaintiff's deposition testimony showed that she was competent and managed her ordinary affairs of life by running a business, raising children, and working another job). In setting the parameters for what does not constitute mental incapacity, the Court of Appeals of Georgia has declined to toll the statute of limitations when a plaintiff was able to "carry on her daily ability to make decisions," even if she did so "with some emotional difficulty." Charter Peachford Behav. Health Sys., 233 Ga. App. at 460, 504 S.E.2d at 524. Further, the

Court of Appeals of Georgia has relied on deposition testimony showing lack of mental incapacity to discount affidavit evidence alleging mental incapacity. See, e.g., Walker, 243 Ga. App. at 236–37, 533 S.E.2d at 130 (finding no mental incapacity in an automobile accident case, despite the plaintiff's affidavit alleging mental incapacity, when her deposition testimony showed that she was able to manage her ordinary affairs of life in the relevant period because, after the accident, she interacted with officers, attempted to take photos of the accident scene, and engaged counsel to represent her); Whisnant v. Coots, 176 Ga. App. 724, 726 337 S.E.2d 766, 768 (1985) (rejecting the plaintiff's mental incapacity argument when the plaintiff's deposition testimony that she could "take care of things that take mental thinking" and that her mental facilities had been intact during the relevant period belied her affidavit alleging mental incapacity).

As indicated above, evidence that a plaintiff carried on certain ordinary affairs of life can undermine a mental incapacity argument. E.g., Walker, 243 Ga. App. at 236–37, 533 S.E.2d at 130 (rejecting mental incapacity argument when the plaintiff was lucid enough during the relevant period to engage counsel to represent her). In one instructive case, the Court of Appeals of Georgia affirmed the trial court's grant of summary judgment to the defendant when the record

contained ample evidence that the plaintiff had suffered from certain mental conditions but also carried on the ordinary affairs of life. Martin v. Herrington Mill, LP, 316 Ga. App. 696, 730 S.E.2d 164 (2012). In that case, the plaintiff was sexually assaulted by an unknown assailant in her apartment. Id. at 696, 730 S.E.2d at 165. The plaintiff later sued her apartment complex for negligence in failing to keep its premises safe. Id. By the time she filed suit, however, the statute of limitations had passed. Id. The plaintiff alleged that the statute of limitations was due to be tolled because she was mentally incompetent. Id. at 696–97, 730 S.E.2d at 165–66. To support her mental incapacity argument, the plaintiff presented evidence that, because of the sexual assault, she was diagnosed with PTSD, suffered exacerbated symptoms from other, pre-existing mental conditions, and was hospitalized for two weeks to receive in-patient psychiatric treatment. Id. at 696–700, 730 S.E.2d at 165–168. Her supporting evidence included the testimony of her social worker, who had provided her with psychological counseling. Id. at 699, 730 S.E.2d at 167. The social worker testified that the plaintiff's "mental-health problems rendered her unable to manage the ordinary affairs of life for about half of the time between the assault and when she filed her complaint." Id. In affirming the trial court's decision not to toll the

statute of limitations, however, the Court of Appeals of Georgia found that there was significant contrary evidence, including the plaintiff's own testimony, that she "was capable of managing the ordinary affairs of life during the time between the assault and the filing of her complaint." Id. at 701, 730 S.E.2d at 168. That contrary evidence included evidence that she had reported her sexual assault and responded to police officers' questions about it, renewed her lease several times, earlier considered hiring an attorney to pursue a case against the apartment complex but declined to do so for financial reasons, taken care of her sister while she recovered from back surgery, purchased a car with financing and made monthly payments on it, engaged in social networking, and handled other complicated everyday tasks. Id. at 698–99, 730 S.E.2d at 166–67. Given this evidence, the court found that beyond a two-week period of hospitalization, the plaintiff "was able to manage the ordinary affairs of life following her tragic assault." Id. Thus, even accounting for the evidence of the plaintiff's mental health conditions and her social worker's direct testimony that the plaintiff was incapable of managing the ordinary affairs of life for much of the time between the assault and the filing of the lawsuit, the Court of Appeals of Georgia affirmed the trial court due to the "significant evidence" that the plaintiff "was capable of

31

managing the ordinary affairs of life during the time between the assault and the filing of her complaint." Id. at 699–701, 730 S.E.2d at 167–68.[18]

On the other hand, appellate courts have found that a jury question as to mental incapacity precluded summary judgment when affidavits or testimony supporting a mental incapacity argument did not directly conflict with evidence that "pierced" the mental capacity argument by showing that the plaintiff had managed the ordinary affairs of life. See, e.g., Tri-Cities Hosp. Auth. v. Sheats, 156 Ga. App. 28, 31, 273 S.E.2d 903, 906 (1980) (affirming denial of summary judgment because, while the plaintiff's deposition testimony tended to show only

_____

[18] Similarly, Georgia courts have found no mental incapacity and granted summary judgment when the record showed that the plaintiff was able to manage the affairs of everyday life and the plaintiff failed to produce material evidence of mental incapacity. E.g., Jacobs v. Littleton, 241 Ga. App. 403, 406, 525 S.E.2d 433, 436–37 (1999) (declining to toll the statute of limitations when the plaintiff's deposition testimony "did not establish her mental incapacity" and instead showed that she was capable of managing her day-to-day affairs because she remained employed during the relevant period); Branch v. Carr, 196 Ga. App. 534, 534–35, 396 S.E.2d 276, 277 (1990) (rejecting the plaintiff's mental incapacity argument because her deposition testimony indicated that she was mentally competent to handle her personal and legal affairs, and because she produced no other evidence of mental incapacity). For example, evidence that a plaintiff "managed the affairs of his life" by being active in litigation, moving his residence several times, working, taking trips, and managing businesses can pierce a mental incapacity theory, especially when the plaintiff does not otherwise satisfy the "burden to come forward with evidence demonstrating that an issue of fact remained" as to mental incapacity. Curlee, 173 Ga. App. at 598–99, 327 S.E.2d at 742.

32

a failure to take control of the ordinary affairs of life rather than an incapacity to manage those affairs, the plaintiff's unequivocal statement in his affidavit that he lacked the mental capacity during the relevant period "to manage certain affairs of his life" did not directly conflict with his deposition testimony and thus created a jury question as to mental incapacity); see also, e.g., Chapman v. Burks, 183 Ga. App. 103, 106, 357 S.E.2d 832, 836–37 (1987) (reversing grant of summary judgment in an automobile accident case because there was no substantial conflict between the plaintiff's affidavit and deposition testimony, which both described the pain-induced mental agony and other mental issues she experienced after the accident); Emory Univ. v. Padgett, 163 Ga. App. 299, 303 294 S.E.2d 300, 303–04 (1982) (affirming denial of summary judgment where a jury question remained as to mental incapacity).

One instructive decision from the Eleventh Circuit illustrates the kind of mental incapacity sufficient to toll the statute of limitations. In Meyer v. Gwinnett County, the plaintiff ("Meyer") had been arrested and detained for nearly twenty months on charges that ultimately were dropped. 716 Fed. App'x at 858. While in jail, he experienced physical and sexual abuse by other inmates, and his mental and physical health severely declined. Id. at 862 (describing how Meyer lost

seventy pounds, developed suicidal thoughts, began to self-mutilate, and became submissive and disoriented). Upon his release, Meyer was paranoid about being taken back to jail and could not "organize any kind of plan of action." Id. A friend picked him up, bought him necessities, took him to an extended-stay hotel, and paid for his room during the relevant period. Id. The next day, Meyer applied for a job at a nearby restaurant where he previously had worked. Id. at 862–63. Although he filled out certain employment paperwork, he later testified that he did not understand the documents, and his coworker stated that Meyer "was obviously unaware of what was going on" when he signed the documents. Id. at 863. That same coworker stated in an affidavit that Meyer seemed "defeated and hopeless" and was in a state of confusion and shock. Id. Moreover, Meyer performed poorly at work—he could not complete basic tasks independently, his coworkers had to remind him when to show up for work and to maintain a clean hygiene and appearance, and he did not timely complete his re-training. Id. The restaurant continued to employ Meyer and did not write him up for work infractions only because of "his prior loyal employment," "the terrible ordeal he had been through," and the fact that his coworkers felt sorry for him and believed he eventually would reacclimate. Id.

Outside of work, Meyer did not go to the grocery store or restaurants, and he did not socialize. Id. He had no cell phone, did not drive, did not pay bills, did not cook, and did not do laundry. Id. He performed basic hygiene tasks—showering, using deodorant, brushing his teeth, shaving—only twice a week. Id. A psychotherapist who treated Meyer later opined that Meyer suffered from several mental conditions, and for at least the three-week period following his release from jail, he was of unsound mind and incapable of managing the daily affairs of life. Id. That psychotherapist also testified that when Meyer was released from jail, he "lacked the capacity to initiate his own behavior and the judgment to make his own decisions," was on "auto-pilot," and had "very minimal cognitive function." Id. at 864. She further opined that Meyer was "mindlessly deferential to authority" and was able to engage in everyday activities—such as tasks at work—only to the extent he was already familiar with them or was directed by others to do them. Id.

Meyer later sued those involved in his arrest and detention, but he did so after the limitations period had run. Id. at 858. He contended that the statute of limitations should have been tolled during periods of mental capacity he alleged to have suffered after he was released from jail. Id. The defendants moved for

35

summary judgment, and the district court found that the tolling provision did not apply, which barred Meyer's claims. Id. at 858–59. The Eleventh Circuit reversed, determining that a reasonable jury could conclude that during the relevant period, Meyer "was so unsound of mind that he was unable to manage the activities of daily life." Id. at 864. The court conceded that Meyer's ability to complete certain activities—such as living on his own, securing and maintaining employment, and feeding himself—suggested that Meyer "had the minimal mental capacity necessary to manage his ordinary affairs." Id. The court also agreed that evidence of his mental health conditions, including PTSD, were not enough on their own to toll the statute of limitations. Id. at 864–65. But the court found that the record contained enough contrary evidence, including testimony from Meyer and affidavits from the psychotherapist and coworker, to allow a reasonable jury to find that Meyer was incapacitated during the three weeks after he was released from jail. Id. The court added that the activities Meyer was shown to have undertaken were not so numerous and complicated that a court could conclude as a matter of law that no reasonable jury could credit the largely consistent evidence tending to show incapacity. Id. at 865–66.

36

With this legal framework in mind, the Court now turns to this case. First, the limitations period for Plaintiff's remaining Title IX and Section 1983 claims against the Barrow Defendants (Doc. No. [1], ¶¶ 36–45, 54–65) was two years. See O.C.G.A. § 9-3-33 (providing a two-year statute of limitations under Georgia law for "injuries to the person"); see also M.H.D. v. Westminster Sch., 172 F.3d 797, 803 (11th Cir. 1999) (determining that Georgia's two-year statute of limitations for personal injuries applies to Title IX claims, especially when the underlying injury leading to the Title IX claim was sexual abuse); Williams v. City of Atlanta, 794 F.2d 624, 626 (11th Cir. 1986) (stating that the limitations period for Section 1983 claims in Georgia is "the two year period set forth in O.C.G.A. § 9-3-33 for personal injuries"). In this case, that two-year period began to run when Plaintiff reached the age of majority on August 11, 2017. See O.C.G.A. § 9-3-90(b); see also Doe v. Saint Joseph's Cath. Church, 313 Ga. 558, 870 S.E.2d 365, 369 n.2 (2022) (finding that because the plaintiff suffered his alleged injuries when he was a minor, O.C.G.A. § 9-3-90(b) tolled the limitation period until he reached the age of majority). Accordingly, absent tolling due to mental incapacity, the statute of limitations for Plaintiff's claims against the Barrow Defendants ran on August 11,

2019. Plaintiff filed this lawsuit on March 27, 2020—more than seven months after the limitations period ended. Doc. No. [1].

Here,[19] the record shows that before the assault, Plaintiff had a learning disability and ADHD. After the assault, she has suffered from an increased level of ADHD and has developed PTSD, depression, and other mood or personality disorders. Dr. Harmon, who began serving as Plaintiff's therapist in 2019, stated that she suffers from a high level of fear that has left her codependent on her mother and has affected her ability to undertake self-care and manage the ordinary affairs of her life. For example, Dr. Harmon states that Plaintiff has been unable to manage her financial affairs independently and has bathed and taken medications only with her mother's prompting.[20] Thus, Dr. Harmon opines, Plaintiff has been unable to live on her own or manage her everyday affairs. Moreover, the record shows that for a while after the assault, Plaintiff stopped

_____

[19] For purposes of this analysis, the Court endeavors to focus on the relevant period of incapacity, which includes the two years after Plaintiff reached the age of majority. However, Plaintiff alleges that she has been mentally incapacitated since the assault. See Doc. No. [1], ¶ 34. As such, some relevant factual developments may span from before the relevant period of incapacity into that period of incapacity—such as Plaintiff attending and then graduating from AHS her senior year. To the extent such facts inform the Court's analysis, the Court will refer to them.

[20] Plaintiff's mother also testified that Plaintiff has not maintained the same level of hygiene and personal appearance and is unable to care for herself.

doing some of her favorite activities, such as going to church. Other activities, such as cooking and shopping at the mall with her mom, she stopped altogether due to a lack of motivation.

On the other hand, the record—including Plaintiff's own deposition testimony—shows that Plaintiff developed and fostered personal relationships after her assault. For example, she reconnected with her biological family and remained in contact with them throughout her senior year of high school, during which she reached the age of majority. Since high school, Plaintiff has maintained multiple social media accounts on various platforms. She has developed or maintained friendships and other significant personal relationships in that time. Recently, Plaintiff removed her mother's access to her social media accounts, phone, and bank accounts to become more independent from her mother.

The record also shows that Plaintiff had academic success in the relevant period. Plaintiff returned to AHS for her senior year and graduated with good grades after she reached the age of majority. She later attended a technical college for a year to study early childhood education, although she withdrew because the heavy college workload made it difficult for her to stay on track.

Moreover, the record shows that Plaintiff has had several jobs that she quit of her own accord. Around when she turned eighteen, Plaintiff began working as a teacher's assistant at a daycare, a job that required her to keep track of her schedule. She resigned from this position so she could focus on school. She later worked at Taco Bell for a year. Although her mother helped her fill out an application for this job, she had to complete an interview to receive the position. Like at her prior job, Plaintiff kept track of her work schedule, which changed weekly. She ultimately left her position at Taco Bell because her co-workers had made a habit of seeking her financial assistance. Plaintiff later got another job at a daycare, working as a teacher's assistant and helping oversee children. She had this job for almost a year until the COVID-19 pandemic began.

Also, looking elsewhere in the record, the Court has considered the ante litem notice attached to the Complaint. Doc. No. [1-1]. That correspondence was dated November 6, 2017—after Plaintiff reached the age of majority and during the period that Plaintiff argues should be tolled. Id. It was sent by the counsel currently representing Plaintiff in this matter, and it concerns the incident and injuries at issue in this lawsuit. Id. While the letter explains that counsel was retained by Plaintiff's mother, it also affirmatively states that counsel was

40

representing Plaintiff. Id.[21] Thus, the Court gathers from the record that Plaintiff had engaged counsel concerning this matter more than a year before the statute of limitations ran on her claims.[22]

Having considered this evidence in the light most favorable to Plaintiff, the Court determines that no reasonable jury could find that Plaintiff was so mentally incapacitated because of her assault that the statute of limitations should be tolled. To make such a finding, a jury would have to determine that Plaintiff was so mentally incapacitated that she could not manage the ordinary affairs of life. The record does not reasonably allow for such a determination.

In and around the relevant period, Plaintiff successfully completed high school. She applied for and was employed in positions that required her to

---

[21] Notably, this letter was attached to a pleading naming only Plaintiff — and not Plaintiff's mother — as the complainant. Doc. No. [1].

[22] While the letter states that counsel was retained by Plaintiff's mother, it makes clear that counsel was at that time representing Plaintiff. Because the Court is unaware of any conservatorship or guardianship (see Gail Isaacs Dep. Tr. 194:16–196:10 (Plaintiff's mother testifying that no guardianship or conservatorship had been filed for Plaintiff)), the Court infers that Plaintiff — who, again, had reached the age of majority by the time the ante litem notice was sent — was sufficiently competent to (1) agree to this counsel representing her and (2) give informed consent regarding material aspects of that representation. See Ga. Rule of Pro. Conduct 1.14 (concerning representation of client with diminished capacity); cf. Ga. Rule of Pro. Conduct 1.2(a) (providing that "a lawyer shall abide by a client's decisions concerning the scope and objectives of representation").

manage changing schedules and, in some cases, look after young children. She developed and fostered close personal relationships with friends and family. She appears to have been sufficiently competent to agree to counsel representing her in relation to the assault. These are all significant and ordinary affairs of life that she undertook during the relevant period.

The Court finds that statements and testimony from Dr. Harmon and Plaintiff's mother do not create a jury question. First, much of their testimony relates to Plaintiff's diagnosed mental conditions, which are not enough to toll the statute of limitations. Further, to the extent these witnesses state that Plaintiff has been unable to manage the ordinary affairs of life, those statements are belied by Plaintiff's own testimony and the record. As illustrated by the facts presented above, Plaintiff finished high school, worked several jobs, maintained social connections, and engaged an attorney to represent her regarding the assault. Moreover, much of Plaintiff's mother's testimony regarding Plaintiff's lack of "motivation" to undertake certain tasks paints much more a "portrait of one who has merely failed to take control of or simply mismanaged the ordinary affairs of life rather than of an individual lacking in the capacity to manage [her] own affairs." See Curlee, 173 Ga. App. at 599, 327 S.E.2d at 742.

42

Looking to the caselaw, the Court observes that the facts of this case are far different than those in <u>Meyer v. Gwinnett County</u>, where the appellate court determined that a reasonable jury could have found that the plaintiff had been incapacitated for a three-week period in which he was so depressed and disoriented that he could not understand much of what was going on around him. He relied on friends and coworkers to obtain necessities and arrange his housing. He kept a job despite poor work performance because his coworkers with whom he previously had worked felt bad for him. The evidence from the plaintiff, his friends, his coworkers, and his psychotherapist were consistent in showing that he was incapable of managing his daily affairs for the relevant three-week period. The Court finds that this case is far more analogous to those where the statute of limitations was not tolled. In many of those cases, the plaintiff suffered from mental illnesses and struggled with certain daily activities. But the records in those cases also showed that such plaintiffs maintained employment, sustained significant personal relationships, engaged counsel to represent them regarding their injuries, and otherwise could carry out day-to-day life activities. Given the facts discussed above, that is exactly the case here.

43

In sum, viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff was not incapacitated to a degree that would make it unfair "the charge [Plaintiff] with the running of the clock." Martin, 316 Ga. App. at 698, 730 S.E.2d at 166. In reaching this decision, the Court does not intend to convey a disbelief that Plaintiff has experienced trauma and mental conditions stemming from her assault. Instead, the Court determines that, under this record, no reasonable jury could find that those conditions rendered her incapable of managing the ordinary affairs of life. Accordingly, Plaintiff's claims are time-barred, and summary judgment is due to be granted to the Barrow Defendants.

### 2. The Barrow Defendants Are Entitled to Summary Judgment on the Merits of Plaintiff's Claims

The Court will also address the merits of Plaintiff's claims. The Barrow Defendants argue that they are due to be granted summary judgment on all of Plaintiff's remaining claims. The Court will analyze those claims in turn.

#### a) The School System Is Entitled to Summary Judgment on Plaintiff's Title IX Claim

Plaintiff argues that the School System violated Title IX because its officials—including the individual Barrow Defendants—were deliberately indifferent to reports of sexual harassment by Clayton, which resulted in his

44

assault of Plaintiff, which in turn resulted in her being "excluded from participating in, denied the benefits of, and subjected to discrimination in" the School System's education program on the basis of her sex. Doc. No. [1], ¶¶ 36–45. Also, Plaintiff contends that the School System violated Title IX after Clayton's sexual assault of Plaintiff by failing to (1) remove Clayton from school until over a month after the sexual assault, (2) provide Plaintiff with appropriate accommodations, and (3) take effective steps to facilitate Plaintiff's "continued equal access to educational opportunities and benefits." Id. ¶¶ 41–42.

In their summary judgment motion, the Barrow Defendants argue that the evidence fails to support an inference that the School System or officials with authority to address the alleged discrimination and institute corrective measures had actual notice of Clayton's prior history of sexual assault. Doc. No. [113-1], 14–15. They contend that Tonya and Keith Crowe were the only individuals associated with the School System who had prior knowledge of Clayton's prior sexual misconduct. Id. at 14. Moreover, they note that the allegations regarding Clayton's younger cousin concerned (1) a victim who was not a student at AHS and (2) interactions that occurred at family gatherings that were outside of the School System's "programs or services, and wholly unrelated to its events or

45

activities." Id. Thus, the Barrow Arguments argue, the Title IX claim fails with respect to alleged deliberate indifference prior to Clayton's assault of Plaintiff because the Barrow Defendants had no prior notice, and there were no prior incidents of alleged harassment occurring within the School System's programs or services. Id. at 15.

The Barrow Defendants also argue that they are entitled to summary judgment as to the post-assault portion of Plaintiff's Title IX claim "because the disciplinary and remedial measures taken in response to the incident were not clearly unreasonable in light of known circumstances." Id. at 15–17. They argue that the evidence shows that they responded to Plaintiff's allegations of assault "in a prompt, responsive, and reasonable manner" and instituted actions that allowed Plaintiff "to complete her education without any further contact with [Clayton] or additional harassment." Id. at 16. As to accommodations and educational services, the Barrow Defendants argue that they provided adequate home-based services that Plaintiff's mother had requested, and about which Plaintiff and her mother had no complaints. Id. Regarding "additional remedial and supportive measures," the Barrow Defendants contend that Plaintiff was already accessing counseling services. Id. Also, the Barrow Defendants argue that

46

no reasonable jury could find that they were deliberately indifferent due to their decision to suspend Plaintiff for two days because she had been out of her assigned area, especially because the record lacks evidence that "Plaintiff was disciplined for being a victim of an alleged sexual assault." Id. at 17.

In response, Plaintiff contends that a reasonable jury could find that the School System was deliberately indifferent to known acts of harassment in its programs or activities in violation of Title IX. Doc. No. [131], 13–21. She argues that she has presented evidence that the School System—via the individual Barrow Defendants, who qualify as "appropriate persons" under Title IX—knew of harassment occurring after the incident. Id. at 14, 17.[23] Plaintiff also contends that because Tonya Crowe was a teacher at AHS, she qualified as an appropriate person under Title IX. Id. at 14–19. And because there is evidence that Tonya

_____

[23] To be clear: Plaintiff contends in her response brief that the individual Barrow Defendants are appropriate persons under Title IX. Doc. No. [131], 14. But whereas she alleges in her Complaint that the individual Barrow Defendants "had actual notice of [Clayton's] previous sexually inappropriate behavior" (Doc. No. [1], ¶ 39), she does not appear to argue in her response brief that they are the appropriate persons with prior knowledge of Clayton's previous sexual misconduct for purposes of the pre-assault portion of her Title IX claim (see Doc. No. [131], 14–19). Instead, Plaintiff apparently rests on evidence of Tonya Crowe's prior knowledge and asserts that she is the relevant appropriate person. See Doc. No. [131], 14–19. As such, the Court's analysis will focus primarily on Tonya Crowe rather than the individual Barrow Defendants when assessing prior knowledge of Clayton's earlier sexual misconduct.

Crowe had prior knowledge of Clayton's earlier sexual misconduct and yet failed to take measures to protect Plaintiff, Plaintiff argues that deliberate indifference is attributable to the Barrow Defendants. See id. at 16–19. Plaintiff also contends that the School System's disciplinary and remedial measures taken in response to the incident were unreasonable. Id. at 19–21. She contends she should not have been suspended for two days because the School System's administrators knew of her "mental deficits and ease to peer pressure." Id. Further, she argues that the educational services provided were unlawfully insufficient. Id.

In reply, the Barrow Defendants reiterate that the Court should grant summary judgment on Count I. Doc. No. [144], 5–12. They argue that Plaintiff has not identified an appropriate person who had knowledge prior misconduct in the School System's programs or activities because (1) AHS administrators testified that they did not know of Clayton's prior misconduct and (2) even if Tonya Crowe could qualify as an "appropriate person," which the Barrow Defendants contest, she knew only of prior incidents that occurred off campus. Id. at 5–7. They maintain that knowledge of the type of *off-campus* behavior at issue here, which was unrelated to the School System's programs, cannot give rise to Title IX liability. Id. at 7–9.

48

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Eleventh Circuit has determined that "[s]tudent-on-student sexual harassment rises to the level of actionable Title IX discrimination only if the harassment is 'sufficiently severe.'" Hill v. Cundiff, 797 F.3d 948, 968 (11th Cir. 2015) (quoting Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 650 (1999)). A plaintiff asserting a Title IX deliberate indifference claim based on student-on-student sexual harassment must establish that (1) the school district was deliberately indifferent to known acts of harassment and (2) the known harassment was so severe, pervasive, and objectively offensive that it denied the plaintiff the equal access to education that Title IX protects. Id. at 968–69. "[A] court can find a Title IX violation when a [school] exhibits deliberate indifference before an attack that makes a student more vulnerable to the attack itself, or when a [school] exhibits deliberate indifference after an attack that causes a student to endure additional harassment." Ross v. Corp. of Mercer Univ., 506 F. Supp. 2d 1325, 1346 (M.D. Ga. 2007).

Under Eleventh Circuit precedent, a plaintiff must satisfy five elements to prove a Title IX deliberate indifference claim stemming from student-on-student harassment. See Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282, 1293 (11th Cir. 2007).[24] First, the defendant must be a recipient of federal funds under Title IX. Id. Second, an "appropriate person" must have actual knowledge of the discrimination or harassment. Id. Third, the discrimination or harassment must be "severe, pervasive, and objectively offensive." Id. (citing Davis, 526 U.S. at 633). Fourth, "a funding recipient is liable for student-on-student harassment only if 'the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities.'" Id. (quoting Davis, 526 U.S. at 633). In considering this element, the Court analyzes the conduct of the funding recipient—not the alleged harasser—to ensure that the recipient is liable only if its deliberate indifference subjected the plaintiff to discrimination. Id. (citing Davis, 526 U.S. at 640–41). And fifth, the plaintiff must demonstrate that the discrimination or harassment "effectively bar[red] the victim's access to an

---

[24] The Court follows the approach set forth in Hill v. Cundiff, 797 F.3d 948 (11th Cir. 2015) and applies Williams as a five-element test.

educational opportunity or benefit." Id. (citing Davis, 526 U.S. at 633); Hill, 797 F.3d at 970.

### (1)    *The School System receives federal funding*

The Barrow Defendants do not contest that the School System receives federal funds, so the Court considers the first element of the Williams test to be met.

### (2)    *No appropriate persons had actual knowledge of Clayton's alleged pre-assault sexual misconduct*

As to the second element of the Williams test, Plaintiff must prove that an "appropriate person" had actual knowledge of the alleged discrimination or harassment. Williams, 477 F.3d at 1293. "[A]n 'appropriate person'. . . is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998). This individual must also be "high enough up the chain-of-command that his acts constitute an official decision by the school district itself not to remedy the misconduct." Hill, 797 at 971 (citation omitted).

The Court agrees with Plaintiff that the individual Barrow Defendants are "appropriate persons" under Title IX because they are AHS and/or School System administrators with authority to take corrective action to end

51

discrimination. <u>See</u> <u>KB v. Daleville City Bd. of Educ.</u>, 536 F. App'x 959, 962–64 (11th Cir. 2013) (finding that a superintendent and a principal were appropriate persons under Title IX and noting that most circuit courts "have not hesitated" to find that such high-ranking school officials generally qualify as appropriate persons).

But the Court does not agree with Plaintiff that Tonya Crowe qualifies as an appropriate person simply because she is a longtime teacher at AHS. Whether an individual qualifies as an appropriate person is a fact-based inquiry, and courts in the Eleventh Circuit have expressed skepticism concerning whether a teacher necessarily qualifies as an appropriate person. <u>See, e.g.</u>, <u>Hawkins v. Sarasota Cnty. Sch. Bd.</u>, 322 F.3d 1279, 1286–88 (11th Cir. 2003) (declining to address whether a teacher could be an appropriate person but noting that an analysis of this issue would require a fact-based inquiry); <u>Snethen v. Bd. of Pub. Educ. for City of Savannah</u>, No. 406CV259, 2008 WL 766569, at *8 (S.D. Ga. Mar. 24, 2008) (expressing doubt that a teacher could qualify as a Title IX "appropriate person" under the facts of the case); <u>but see</u> <u>J.S., III by & through J.S. Jr. v. Houston Cnty. Bd. of Educ.</u>, 877 F.3d 979, 987–90 (11th Cir. 2017) (finding two teachers to be appropriate persons under Title IX). The record indicates that

Tonya Crowe learned of Clayton's prior conduct and had control over Clayton in her capacity as his mother, rather than in her capacity as a teacher at AHS. In one case, the Eleventh Circuit found that teachers qualified as appropriate persons when the record showed that they—*in their roles as teachers*—had supervisory responsibility over and authority to take corrective action as to the alleged assailant. J.S., 877 F.3d at 987–90. Here, there is no evidence that Tonya Crowe had supervisory responsibility over Clayton in her role as an AHS teacher.[25] The Court has serious doubts about whether a teacher is an appropriate person under Title IX largely by virtue of her being a parent of the alleged assailant. In any event, in light of the authority cited above, the Court finds that Plaintiff has not carried her burden to show that Mrs. Crowe qualifies as an appropriate person under Title IX. Plaintiff argues only that Mrs. Crowe is an appropriate person because she had taught at the school for more than twenty years and was also a coach there. Those attributes do not transform a teacher into an appropriate person without more evidence that she, in her role as a teacher, had supervisory responsibility over and authority to take corrective action as to

---

[25] For example, Plaintiff has not shown that Mrs. Crowe taught Clayton or had a direct supervisory responsibility over him at AHS in her role as a teacher.

the alleged assailant. And here, the lack of evidence regarding Mrs. Crowe's direct supervisory authority over Clayton in her role as a teacher distinguishes her from teachers found to have been appropriate persons in this Circuit's caselaw. Accordingly, the Court finds that Tonya Crowe was not an appropriate person for purposes of pre-assault Title IX liability.[26]

As for the post-assault portion of Plaintiff's Title IX claim, the Court finds that the individual Barrow Defendants qualify as appropriate persons with knowledge of the assault. Thus, the Court moves on to determining whether there is evidence to support the post-assault portion of Plaintiff's Title IX claim.

---

[26] The Court adds two points. First, the Barrow Defendants make a strong argument that because Clayton's prior sexual misconduct occurred off campus, it was unrelated to any of the School System's programs or activities. To that end, the facts of this case differ from those in Hill v. Cundiff, where the student assailant had accumulated an extensive record of sexual misconduct at school or in school-related spaces, such as a school bus. 797 F.3d at 959–61. Thus, the fact that Clayton's prior sexual misconduct occurred off campus and years prior further militates against finding that an appropriate person had knowledge of discrimination "in the recipient's programs." See Gebser, 524 U.S. at 290. Second, the Court briefly addresses whether there is evidence that the individual Barrow Defendants had pre-assault knowledge. As stated above, although Plaintiff alleged in her Complaint that these Defendants were appropriate persons who had pre-assault knowledge of Clayton's prior sexual misconduct, she does not contend in her response brief that the evidence supports this allegation. Moreover, after review, the Court finds that the record does not show that the individual Barrow Defendants or other appropriate persons associated with AHS or the School System had prior knowledge of Clayton's misconduct such that the Barrow Defendants exhibited deliberate indifference before Plaintiff's assault in a way that made her more vulnerable to the assault. See supra n.6.

### (3)   *No reasonable jury could find deliberate indifference*

Third, Plaintiff must show that the School System was deliberately indifferent "where [its] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." <u>Hill</u>, 797 F.3d at 973 (quoting <u>Davis</u>, 526 U.S. at 648). "A clearly unreasonable response [by the School System] causes students to undergo harassment or makes them more vulnerable to it." <u>Id.</u> (citing <u>Williams</u>, 477 F.3d at 1295–96). In applying this standard, a court should avoid "second-guessing the disciplinary decisions made by school administrators." <u>Davis</u>, 526 U.S. at 648.

Here, the Court considers whether the School System's response to Plaintiff's report of the sexual assault and its later acts were unreasonable and caused Plaintiff to undergo or be vulnerable to further harassment. Viewing the evidence in the light most favorable to Plaintiff, the Court finds that she has not established deliberate indifference. Immediately after the assault, school officials responded promptly by questioning the students involved and notifying the School System's Title IX Coordinator. In just over a month, that investigation resulted in a finding that the incident between Plaintiff and Clayton was unwanted by Plaintiff. Further, Clayton was not allowed to return to school,

which allowed Plaintiff to complete her high school career at AHS without having to interact with him.[27] Cf. Williams, 477 F.3d at 1296–97 (finding sufficient allegation of deliberate indifference when the university waited more than eight months to institute disciplinary hearings against the assailants and ultimately did not sanction those assailants). Plaintiff also contends that Tonya Crowe stared at Plaintiff "three" or "four times" after Plaintiff returned from school, which made

---

[27] In her response brief, Plaintiff refers to a potential protest or demonstration at AHS against Plaintiff in relation to the assault. Doc. No. [131], 17–18. From its review of the relevant depositions—namely, those of Plaintiff, Principal Martin, and Tonya Crowe—the Court understands that in or around April of 2017, Principal Martin learned from AHS faculty of the planning of a protest in which students would wear shirts bearing the message "she was on top." Concerned that Tonya Crowe was involved, Principal Martin emailed Mrs. Crowe and stated that the school would not tolerate such a disruption. Mrs. Crowe responded that she was not aware of the protest and would discourage it if needed. Plaintiff testified that she learned about this planned protest after she returned for her senior year at AHS, but she did not tell school officials about it or that it made her uncomfortable. The Court did not see evidence that this protest occurred, and Plaintiff did not point the Court to any such evidence.

The Court cannot find that this course of events gives rise to deliberate indifference. First, although the record contains statements that this protest was planned after Plaintiff returned to AHS, the fact that Principal Martin's email was sent in April of 2017 indicates that the protest was being planned when Plaintiff was still doing at-home schooling. In any event, to the extent the possibility of this protest made Plaintiff uncomfortable, the Court cannot find that school officials' response to the rumors about the protest was unreasonable. Principal Martin responded to the rumors of the protest to help ensure that Mrs. Crowe did not encourage it. Whether Principal Martin could have done something more is the type of second-guessing in which this Court should not engage. Further, the protest did not occur, so the Court cannot find that Principal Martin's response was unreasonable. Accordingly, the Court determines that no reasonable jury could find deliberate indifference stemming from this planned protest.

56

her feel uncomfortable. Plaintiff Dep. Tr. 225:5–226:7. But Plaintiff also testified that Mrs. Crowe never said anything to her. Plaintiff Dep. Tr. 226:8–10. Further, Plaintiff does not direct the Court to evidence that school administrators knew that Mrs. Crowe stared at Plaintiff on three or four occasions. Under these facts, no reasonable jury could find deliberate indifference.

Moreover, the fact that Plaintiff was suspended for "being out of her assigned area" does not render the School System's actions clearly unreasonable in light of known circumstances. Principal Martin testified that this infraction was akin to "skipping class" and that a two-day suspension was normal for such an infraction. Martin Dep. Tr. 171:25–172:3. Nothing in the record allows a reasonable inference that Plaintiff was being punished because she was a victim of a sexual assault. And Plaintiff's arguments that she was suspended "despite Defendants' knowledge of Plaintiff's low cognitive abilities and documented reports of easily being peer pressured" do not alter that conclusion because that does not change that Plaintiff received a suspension for an admitted infraction.

Turning to the academic and other accommodations that school officials offered, the Court finds no deliberate indifference. Within weeks of the assault, school officials convened a meeting to discuss accommodations, supports, and

services for Plaintiff. After this meeting and for the rest of the 2016–2017 school year, the School System provided Plaintiff with home-based services, and Plaintiff does not point to evidence that she or her mother complained about these services. Also, school officials understood that Plaintiff was already accessing counseling services and did not believe that Plaintiff wished to have additional services. Under these circumstances, the services provided and the decision not to offer supplemental counseling services do not rise to the level of deliberate indifference. Plaintiff complains about matters such as the number of visits she received while at home and how she received assignments (see Doc. No. [131], 19–21), but this Court will not second-guess what the evidence shows to have been reasonable accommodations and decisions under the circumstances.

This case differs from Hill, where the Eleventh Circuit determined that a jury reasonably could have found deliberate indifference when the school knew about the assailant's prior sexual misconduct, set up a "rape-bait" scheme with the plaintiff as the "bait" to catch the assailant, and later failed to provide the plaintiff with post-assault support or materially change sexual harassment policies. 797, F.3d at 973–75. Whereas a reasonable jury could have found that the school officials' actions in Hill were unreasonable and made the victim more

58

vulnerable to further harassment, the acts of the School System and its officials do not allow for such a finding.

The "deliberate indifference standard is rigorous and hard to meet." Id. at 975. After carefully considering all the events and circumstances, the Court finds that Plaintiff has not created a genuine issue of fact as to whether the School System was deliberately indifferent.

> **(4)   No reasonable jury could determine that there was severe, pervasive, and objectively offensive sexual harassment or discrimination**

Fourth, Plaintiff must show that the sexual harassment or discrimination of which the School System had actual knowledge was "severe, pervasive, and objectively offensive." Williams, 477 F.3d at 1282 (citing Davis, 526 U.S. at 633). "Whether gender-oriented conduct rises to the level of actionable [Title IX] harassment . . . depends on a constellation of surrounding circumstances, expectations, and relationships . . . ." Hill, 797 F.3d at 972 (quoting Davis, 526 U.S. at 651). To be considered "severe, pervasive, and objectively offensive," "the behavior must be serious enough to have a 'systemic effect' of denying equal access to an education." Id. (quoting Davis, 526 U.S. at 652). One incident of student-on-student harassment, even if severe, often cannot have a sufficiently

systemic effect to satisfy this element. Id., 797 F.3d at 972; see also Williams, 477 F.3d at 1298 (indicating that single incidents are "rarely actionable"); Hawkins, 322 F.3d at 1289 (stating that for Title IX liability, "gender discrimination must be more widespread than a single instance of one-on-one peer harassment and . . . the effects of the harassment [must] touch the whole or entirety of an educational program or activity"). Sometimes, a sexual assault along with other harassment or discrimination surrounding the assault may satisfy this element. See Williams, 477 F.3d at 1298.

Here, the Court assumes that Clayton sexually assaulted Plaintiff. To be sure, a jury reasonably could find that this incident was severe. But it was a lone incident. The Eleventh Circuit has made clear that a single instance of student-on-student harassment generally cannot have a sufficiently systemic effect to satisfy this element. Even accounting for the post-assault acts by school officials, the evidence does not show sexual harassment or discrimination that was sufficiently severe, pervasive, and objectively offensive to have a systemic effect of denying Plaintiff equal access to an education.

Furthermore, this case differs from Hill and Williams in that Plaintiff has not shown that Clayton had engaged in prior sexual misconduct of which the

Barrow Defendants were aware. In <u>Hill</u>, the harassing student had "accumulated a disciplinary history of violence and sexual misconduct." <u>Hill</u>, 797 F.3d at 958–61. Also, the school officials in <u>Hill</u> "effectively participated" in the assailant's harassment by setting up a "rape-bait scheme" to catch the assailant "in the act." <u>Id.</u> at 972. Thus, school officials exposed the victim to harm, and they later failed to respond adequately to her traumatic injury. <u>Id.</u> And in <u>Williams</u>, the plaintiff alleged that the defendants knew of the assailant's previous "disciplinary and criminal problems, particularly those involving harassment of women, at other colleges." <u>Williams</u>, 477 F.3d at 1290. The constellation of factors in those cases allowed for a finding of sufficiently severe, pervasive, and objectively offensive sexual harassment and discrimination. Similar facts are absent here. Indeed, this case better resembles <u>Ross</u>, where the court determined that one incident of sexual assault, even if traumatic to its victim, was not pervasive and was unlikely to have had a systemic effect on educational activities without other aggravating factors. <u>See</u> <u>Ross</u>, 506 F. Supp. 2d at 1358–59.

Accordingly, the Court finds that Plaintiff has failed to provide enough evidence for a jury to conclude that her discrimination was severe, pervasive, and objectively offensive.

61

>    **(5)    *No reasonable jury could determine that Plaintiff was denied access to an educational opportunity or benefit***

Finally, Plaintiff must show that there is a genuine dispute of material fact as to whether the assault and the School System's acts combined to "effectively bar[] [Plaintiff's] access to an educational opportunity or benefit." Davis, 526 U.S. at 633. If defendants' acts make a victim's withdrawal from school "reasonable and expected," a jury reasonably may find that the student was denied access to an educational opportunity or benefit. See Hill, 797 F.3d at 975–76; see also Williams, 477 F.3d at 1298–99 (finding that the plaintiff had sufficiently alleged that she was denied access to an educational opportunity or benefit when the university significantly delayed disciplinary proceedings against the assailants, which allegedly caused the plaintiff not to reenroll).

Although Plaintiff undertook at-home schooling for the rest of her junior year of high school because of the assault, she did so of her own accord. Further, administrators removed Clayton from AHS, which distinguishes this case from the example presented in Davis where the presence of harassers could cause a "physical deprivation of access to school resources." 526 U.S. at 650–51; see also Hill, 975–76 (where school officials allowed the assailant to return to school,

which made it reasonable for the plaintiff to fear returning to school). Plaintiff returned to AHS for her senior year, and she later graduated. Under these facts, no reasonable jury could find that the assault and the Barrow Defendants' later acts denied Plaintiff equal access to an educational program or activity. Nor did they "so undermine[] and detract[] from [her] educational experience, that [she] has effectively been denied access to an institution's resources and opportunities." Hawkins, 322 F.3d at 1289.

For the reasons provided above, the Court finds that the School System is entitled to summary judgment on the merits of Plaintiff's Title IX claim.

> **b)** **The School System, Principal Martin, and Assistant Principal Boyd Are Entitled to Summary Judgment on Plaintiff's Section 1983 Failure-to-Train Claim**

Plaintiff alleges that the School System, Principal Martin, and Assistant Principal Boyd violated her right to equal protection by failing to train administrators, teachers, staff, employees, students, and parents concerning policies on reporting and addressing sexual harassment of students. Doc. No. [1], ¶¶ 54–60. She alleges that these Barrow Defendants failed to advise employees regarding school policies on investigating and responding to reports of sexual assault, as well as protecting students from such incidents. See id. ¶¶ 55–56. She

63

alleges that this failure to train caused a violation of her substantive due process rights. Id. ¶¶ 58–60.

The Barrow Defendants seek summary judgment on this claim, arguing that Plaintiff fails to show that her injury stems from an established policy or custom of the Barrow Defendants. Doc. No. [113-1], 18–20. They argue that the School System adopted multiple policies concerning student safety and security, which included policies related to sexual harassment and assault, and which were communicated to staff and students. Id. at 18–19. Administrators received Title IX training. Id. at 19. Principal Martin knew that she would need to report an alleged sexual assault to the School System's Title IX Coordinator, which she did in this case. Id. Moreover, the Barrow Defendants contend that Plaintiff had not identified facts from which a reasonable juror could find a failure to provide adequate Title IX training or any causal connection between such an alleged failure to train and Plaintiff's injury. Id. In fact, the Barrow Defendants argue, their preparation led to a prompt and adequate investigation of the incident, and school officials began identifying and providing adequate educational services for Plaintiff before that investigation ended. Id. at 19–20. Accordingly, the Barrow Defendants argue, this claim fails as a matter of law. Id. at 20.

In response, Plaintiff argues that she can succeed on her failure-to-train claim by showing that there was an obvious need for more or different training and that the inadequacy of the then-present training was so likely to result in the violation of constitutional rights that the policymakers reasonably can be said to have been deliberately indifferent to the need. Doc. No. [131], 21–22. Plaintiff argues that although the Barrow Defendants "adopted varying policies related to student safety and security, including policies related to sexual harassment, retaliation and the duty to report," those policies were not followed, which caused Plaintiff's alleged injury. Id. at 22. For example, Plaintiff contends that the Barrow Defendants did not provide trainings for Chee Fest volunteers, and there was no "strategic or organized placement of faculty and staff." Id. Also, Plaintiff argues that the Barrow Defendants did not adhere to their "prohibition against retaliation and intimidation of a sex assault complainant" when Principal Martin warned Tonya Crowe against participating in a protest of Plaintiff, which Plaintiff describes as only "a slap on the wrist." See id. at 23. Plaintiff also emphasizes the testimony of certain Barrow Defendants, who testified that there were no trainings "specific" and "exclusive" to sexual assaults and that AHS did not have training materials specific to report sexual assaults. Id. Because there

65

had been reports of other sexual assaults "in the County and at AHS," Plaintiff argues, the need for such training was clear. See id. at 23–24.

In reply, the Barrow Defendants argue that Plaintiff fails to identify any violation of a policy or show that the policies were inadequate or, beyond non-specific statements to this effect, "not adhered to." Doc. No. [144], 13–14. They contend that Plaintiff must show that the lack of training amounts to deliberate indifference, which requires a showing that the Barrow Defendants knew of a need to train in a particular area and made a deliberate choice not to institute such training. See id. at 13. The Barrow Defendants argue that Plaintiff fails to make this showing because she focuses on arguing about training and placement of teachers and staff for Chee Fest, and there is no obligation under Section 1983 to craft "individual, specific training relative and unique to each and every single event involving the supervision of students." Id. at 14.

To succeed on her Section 1983 failure-to-train claim, Plaintiff must show deliberate indifference in one of two ways. First, Plaintiff could show that these Barrow Defendants were aware that a pattern of constitutional violations existed and yet failed to provide adequate training to address that pattern of violations. Lewis v. City of W. Palm Beach, Fla., 561 F.3d 1288, 1293 (11th Cir. 2009). Such a

66

pattern of violations must be widespread to give rise to constitutional liability. See Mingo v. City of Mobile, Ala., 592 F. App'x 793, 799 (11th Cir. 2014). Second, Plaintiff could show that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." City of Canton v. Harris, 489 U.S. 378, 390 (1989). Plaintiff must show that the failure to train caused her alleged constitutional injury. Id. at 389.

Plaintiff must show a "glaring omission" rather than simply "possible imperfections" in the training. Gold v. City of Miami, 151 F.3d 1346, 1352 (11th Cir. 1998) (citation omitted). A defendant is not deliberately indifferent simply because the measures it takes are ultimately ineffective. Sauls v. Pierce Cty. Sch. Dist., 399 F.3d 1279, 1285 (11th Cir. 2005). The deliberate indifference standard under Section 1983 is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Hill, 797 F.3d at 977 (citation omitted). Section 1983 liability based on a single incident is appropriate only in some, narrow sets of circumstances. See Borton v. City of Dothan, 734 F. Supp. 2d 1237, 1256 (M.D. Ala. 2010) (noting that the Eleventh Circuit has "repeatedly rejected" attempts to establish single-incident failure-to-

train claims); <u>see also</u> <u>Doe v. Sch. Bd. of Miami-Dade Cnty.</u>, 403 F. Supp. 3d 1241, 1265 (S.D. Fla. 2019) (stating that the narrow "single incident" theory of liability generally has not been applied in cases involving a school's failure to adequately respond to reports of sexual harassment and assault).

To start, although Plaintiff refers in her brief to prior sexual assaults, the deposition testimony she cites shows that: (1) one of the incidents occurred in 2020, well after Clayton's assault of Plaintiff; and (2) Principal Martin clarified that she was discussing not "assaults," but rather "sexual incident[s]." <u>See</u> Martin Dep. Tr. 57:10–61:12. The 2020 assault cannot have given the Barrow Defendants notice of a need for more or different training in this case because the assault at issue occurred years before. In any event, to the extent the prior sexual incidents resulted in violations of constitutional rights, no reasonable jury could determine that three such prior incidents constitute such a "widespread" pattern to give rise to constitutional liability. Absent a pattern of constitutional violations or other evidence of a glaring omission or deficiency in the trainings at issue, the Court also cannot find that the need for different training was so obvious that a failure to provide such training was likely to result in a constitutional violation. The evidence simply does not meet that high bar.

Plaintiff's other arguments do not help her, either. Plaintiff concedes that the Barrow Defendants instituted policies that concerned sexual harassment, but she contends that they were not followed. Plaintiff's examples of these alleged failures to follow procedure are not availing. She appears to contend that AHS officials should have provided sexual assault training specific to Chee Fest. While a school may certainly subject itself to Section 1983 liability by completely failing to provide relevant training, the Court disagrees that a school is liable by not providing training specific to sexual assault for every major school event. Also, Principal Martin did not fail to follow relevant policies when she admonished Tonya Crowe against participating in a potential protest that would have been harassing to Plaintiff. The protest did not occur, and Principal Martin aptly conveyed the AHS administration's position that it would not tolerate such a protest. Nothing about that course of events shows a failure to adhere to policies. Instead, the evidence shows that the Barrow Defendants provided or received training each year that incorporated discussion of sexual assault and related matters. That the Barrow Defendants may not have had training sessions focused solely on that subject does not necessarily create Section 1983 liability, and the Court finds that it does not here. As the Barrow Defendants argue, the record

shows that the School System had adopted multiple policies concerning student safety, including policies relating to sexual harassment and assault. The evidence also shows that these policies were followed, including with respect to Plaintiff's assault. At the very least, there were no departures from policy — or failures to institute other policies — that rose to the level of deliberate indifference. Finally, the Court finds that the evidence shows no policy or custom of the School System that caused Plaintiff's alleged injury.

Accordingly, the Court finds that these Barrow Defendants are entitled to summary judgment as to Plaintiff's § 1983 failure-to-train claim.

### c)   Dr. McMichael is Entitled to Summary Judgment on Plaintiff's Supervisory Liability Claim

Plaintiff alleges that Superintendent McMichael is subject to liability under Section 1983 for failing to supervise subordinates, including Principal Martin and Assistant Principal Boyd, whom he knew were not following Title IX guidelines for sexual assaults. See Doc. No. [1], ¶¶ 61–65. The Barrow Defendants argue that Dr. McMichael is entitled to summary judgment on this claim because it rests on a theory of supervisory liability that turns on whether Principal Martin and Assistant Principal Boyd were liable under the Title IX and failure-to-train claims. Doc. No. [113-1], 20–21. Plaintiff responds that the record allows for a finding that

70

trainings related to sexual assault were inadequate and resulted in constitutional injuries, which supports this claim. See Doc. No. [131], 24–25.

The Court agrees with the Barrow Defendants. The Court's findings above as to Plaintiff's Title IX and failure-to-train claims all but mandate summary judgment on this claim. Moreover, supervisory liability under Section 1983 must be based on something more than a theory of respondeat superior. Rather, it requires a showing of personal involvement in the constitutional violation or a showing of a history of widespread abuse that puts the supervisor on notice of the need to correct the violations, which the supervisor then fails to do. Braddy v. Fla. Dep't of Lab. & Emp. Sec., 133 F.3d 797, 801–02 (11th Cir. 1998) (citations omitted). The record lacks evidence that Dr. McMichael's own conduct gives rise to constitutional liability. Nor is there evidence to meet the high bar to make him liable for the actions of his subordinates. See Braddy, 133 F.3d at 802 (describing this standard as "extremely rigorous"). Thus, the Court finds that Dr. McMichael is entitled to summary judgment on this claim.

In sum, the Motion for Summary Judgment is due to be granted.[28]

---

[28] The Court has also reviewed Plaintiff's Motion for Leave to File Surreply (Doc. No. [145]), which the Barrow Defendants oppose (Doc. No. [146]). In short, Plaintiff asserts

### B.    Motions for Reconsideration and Oral Argument

The Court now turns to Plaintiff's Motion for Reconsideration (Doc. No. [127]) and the related Motion for Oral Argument (Doc. No. [128]). Earlier in these proceedings, the Barrow Defendants and Crowe Defendants separately moved for partial judgment on the pleadings. Doc. Nos. [37]; [51]. After considering briefing on these matters, the Court partially granted the Barrow Defendants' motion and granted the Crowe Defendants' motion. Doc. No. [109]. One claim dismissed from this action was Count VIII, [29] a negligent supervision claim against Tonya and Keith Crowe. Id. at 35–39. In that claim, Plaintiff alleged that Clayton's parents had negligently breached their duty to monitor and supervise

_____

that the Barrow Defendants improperly raised new arguments and information in their reply brief, and the Barrow Defendants contend that any "new" information in their reply brief was properly responsive to arguments Plaintiff made in her response brief. After review, the Court finds that the motion is due to be denied because the Barrow Defendants' reply brief can reasonably be construed as directly responsive to arguments in Plaintiff's response brief. See Int'l Telecomms. Exch. Corp. v. MCI Telecomms. Corp., 892 F. Supp. 1520, 1530 (N.D. Ga. 1995) (indicating that a surreply is not necessary to the extent the movant "merely replies to defenses raised by" a non-movant's response brief).

[29]   The Court also dismissed: Count II, a Section 1983 "hostile environment" claim against the Barrow Defendants; Count V, a negligence claim against Principal Martin and Assistant Principal Boyd; Count VI, a claim for recklessness and wantonness against Principal Martin and Assistant Principal Boyd; and Count VII, a claim for negligent, reckless, and wanton hiring, training, and supervision against the individual Barrow Defendants.

Clayton, which resulted in Clayton sexually assaulting Plaintiff. Doc. No. [1], ¶¶ 80–83. The Court dismissed Count VIII after finding that Plaintiff had failed to plead sufficient supporting facts regarding Clayton's alleged prior sexual misconduct or whether Clayton's parents were on notice of such alleged misconduct. Doc. No. [109], 35–38.

Plaintiff later moved for the Court to reconsider its decision to dismiss Count VIII. Doc. No. [127]. Plaintiff stated that evidence produced in discovery after the filing of and briefing on the Motion for Judgment on the Pleadings showed that the Crowe Defendants had been aware of allegations of Clayton's prior sexual misconduct. Doc. No. [127-1], 3–7. Plaintiff argued that she had adequately alleged that Clayton's parents had knowledge of Clayton's prior sexual misconduct and that the Court erred in too strictly reviewing her allegations to that effect. See id. at 10–14. Plaintiff also argued that the newly discovered, previously unavailable evidence supported Plaintiff's assertions that Clayton's parents "had prior notice and knowledge of" Clayton's prior misconduct. Id. at 11–13.

The Crowe Defendants responded in opposition, arguing that Plaintiff was improperly attempting to relitigate an issue that the Court had correctly decided.

Doc. No. [130], 5–6. The Crowe Defendants contended that Plaintiff's arguments concerning newly discovered evidence fail in this context because she appears to have possessed information when she filed her Complaint that would have helped her survive the Motion for Judgment on the Pleadings, but which she failed to use in her Complaint's allegations. See id. at 6–10. Also, the Crowe Defendants argued that information produced during discovery should not provide a basis for reconsideration of an order on a pre-discovery dispositive motion that dismissed claims for pleading deficiencies. See id. at 11–12.

In reply, Plaintiff argued that when she filed the Complaint, she alleged what she knew about concerning Clayton's prior sexual misconduct and his parents' knowledge thereof. See Doc. No. [142], 1–5, 7–11. She also reiterated that the Court reviewed the Complaint's allegations too strictly and that the newly discovered evidence produced during discovery supported her motion for reconsideration. See id. at 9–14.

As to Plaintiff's Motion for Oral Argument, the Local Rules provide that "[m]otions will be decided by the Court without oral hearing, unless a hearing is ordered by the Court." LR 7.1(E), NDGa. Courts in this district have denied requests for oral argument upon determination that "oral argument [would not

be] necessary to further explain the positions of the parties or the applicable law." White v. Sears, Roebuck & Co., No. CIV.A.103CV00002GET, 2006 WL 2617136, at *1 (N.D. Ga. Sept. 12, 2006); see also Kramer v. Gwinnett Cnty., Ga., 306 F. Supp. 2d 1219, 1223–24 (N.D. Ga.) (denying request for oral argument because the necessary evidence was already before the court). After reviewing these filings, the Court has determined that oral argument is not necessary to further explain the relevant positions, so the motion for oral argument is due to be denied. Thus, the Court turns to the merits of the motion for reconsideration.

A court has significant discretion to deny a motion for reconsideration. Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs., 225 F.3d 1208, 1216 (11th Cir. 2000). Under the Local Rules, a party should file a motion for reconsideration only when "absolutely necessary." LR 7.2(E), NDGa. "Reconsideration is only 'absolutely necessary' where there is: (1) newly discovered evidence; (2) an intervening development or change in controlling law; or (3) a need to correct a clear error of law or fact." Bryan v. Murphy, 246 F. Supp. 2d 1256, 1258–59 (N.D. Ga. 2003).

As an initial matter, the Court finds that its decision above concerning the statute of limitations controls the outcome of this matter. Plaintiff's claim in

Count VIII alleged that Tonya and Keith Crowe "negligently breached" their duty to monitor and supervise Clayton, which "negligence" resulted in Clayton sexually assaulting Plaintiff. Doc. No. [1], ¶¶ 82–83. Under Georgia law, the two-year statute of limitations set forth in O.C.G.A. § 9-3-33 applies to negligence-based claims that relate to a personal injury. Flowers v. Fulton Cnty. Sch. Sys., 654 F. App'x 396, 401 (11th Cir. 2016) ("Claims of negligence . . . 'constitute claims of injury to the individual,' and therefore are governed by Georgia's two-year statute of limitations for personal injury . . . ."); M.H.D., 172 F.3d at 803 (applying Georgia's two-year statute of limitations to a negligence claim constituting a claim of "injury to the individual"). Also, courts have found that claims for "negligent supervision" in the workplace are subject to Georgia's two-year statute of limitations. See, e.g., Williams v. Lear Operations Corp., 73 F. Supp. 2d 1377, 1380 (N.D. Ga. 1999) (applying two-year statute of limitations for claim of negligent supervision and retention). Here, because the claim in Count VIII sounds in negligence and concerns a personal injury, the Court finds the two-year statute of limitations applies.[30] Because Plaintiff brought this claim after the

---

[30] Although Plaintiff did not move for this Court to reconsider its decision to dismiss the other claims dismissed by the Order at Doc. No. [109], the Court notes that each of

limitations period ended, the claim is time barred. Plaintiff's Motion for Reconsideration is due to be denied on that basis alone.

Looking beyond the statute of limitations, the Court finds that the Motion for Reconsideration is also due to be denied on substantive grounds. After review,

_____

those claims is also subject to the two-year statute of limitations and thus time barred:

Count II's "hostile environment" claim brought under Section 1983 is subject to the two-year statute of limitations. Reynolds v. Murray, 170 F. App'x 49, 50 (11th Cir. 2006) (stating that Section 1983 action filed in Georgia is governed by Georgia's personal injury statutory limitation period of two years); cf. Gray v. City of Montgomery, No. 2:16CV48-WHA, 2016 WL 4267625, at *6 (M.D. Ala. Aug. 11, 2016) (stating that a two-year statute of limitations applied to a hostile environment in Alabama, which also has a two-year statute of limitations for personal injury claims).

Count V's negligence claim is subject to the two-year statute of limitations. Flowers, 654 F. App'x at 401; M.H.D., 172 F.3d at 803 (applying Georgia's two-year statute of limitations to a negligence claim constituting a claim of "injury to the individual").

Count VI's claim for recklessness and wantonness, if it is even an actionable standalone claim under Georgia law, would be subject to the two-year statute of limitations because it sounds in negligence and concerns a personal injury. See Flowers, 654 F. App'x at 401; see also Rega v. Georgia, No. CV 115-087, 2016 WL 1317693, at *4 (S.D. Ga. Apr. 1, 2016) (stating that there is no "Georgia cause of action for wantonness").

Count VII's claim for negligent, reckless, and wanton hiring, training, and supervision is subject to the two-year statute of limitations. See Harper v. Patterson, 270 Ga. App. 437, 438–39, 606 S.E.2d 887, 890–91 (2004) (applying two-year statute of limitations in O.C.G.A. § 9-3-33 to claims for negligent hiring, supervision, and retention); see also Williams by & through Williams v. Fulton Cnty. Sch. Dist., No. 1:14-CV-0296-AT, 2015 WL 13264434, at *3–4 (N.D. Ga. Jan. 9, 2015) (applying "Georgia's two-year statute of limitations applicable to injuries to the person" to a claim for negligent hiring and retention); Williams, 73 F. Supp. 2d at 1380 (applying two-year statute of limitations for claim of negligent supervision and retention); cf. Doe, 313 Ga. at 870 S.E.2d at 369 & n.1 (indicating that, absent tolling, the two-year statute of limitations applies to a claim for "negligent failure to train, supervise, and monitor" in a child-abuse action).

the Court finds no clear error in its determination that Plaintiff's factual allegations were insufficient to carry the negligent supervision claim. Also, the Court rejects Plaintiff's argument that newly discovered evidence supports her bid for reconsideration. Although newly discovered evidence can be the basis for reconsideration in some circumstances, Plaintiff's newly discovered evidence does not support this motion because the Court dismissed Count VIII due to pleading deficiencies that were attacked in a ***pre-discovery*** Motion for Judgment on the Pleadings. "Evidence newly uncovered by [Plaintiff in discovery] does not impact the facial sufficiency of [her] pleading." Pharma Supply, Inc. v. Stein, No. 14-80374-CIV, 2015 WL 11393827, at *1 (S.D. Fla. June 2, 2015). The Court finds that it would be inappropriate to consider evidence produced during discovery in determining whether to reconsider a decision made regarding the sufficiency of pleadings. See Ass'n For Disabled Americans, Inc. v. Reinfeld Anderson Fam. Ltd. Prt., No. 1:12-CV-23798, 2015 WL 1810536, at *4 (S.D. Fla. Apr. 21, 2015) (declining to reconsider an order on a motion to dismiss based upon new evidence).[31]

---

[31] To elaborate, had Plaintiff been asking this Court to reconsider an order on a motion for summary judgment due to newly unearthed, material evidence that could not have

This decision finds support in the standard for considering a motion for judgment on the pleadings. "[W]hen resolving a motion for judgment on the pleadings, a court must consider only the pleadings: the complaint, the answer, and any documents attached as exhibits." GoPlus Corp. v. Crown Equip. Corp., 533 F. Supp. 3d 1344, 1352 (S.D. Ga. 2021) (citation omitted). If a court considers any evidence that is not attached to the pleadings, not central to the plaintiff's claim, and not undisputed, the court must convert the motion into one for summary judgment. Horsley v. Feldt, 304 F.3d 1125, 1134 (11th Cir. 2002). The evidence that Plaintiff cites to support her bid for reconsideration was produced during discovery and after briefing concluded on the Motion for Judgment on the Pleadings—thus, it was not and could not have been attached to the pleadings. As such, this "newly discovered evidence" that is the primary basis for Plaintiff's request for reconsideration is evidence that the Court could not have considered

_____

been discovered earlier with reasonable diligence, the Court might have been able to review that evidence and reconsider its ruling. See King v. Bd. of Cnty. Comm'rs, 916 F.3d 1339, 1350 (11th Cir. 2019). But whereas a court considers evidence when ruling on a motion for summary judgment, a court generally does not consider evidence when ruling on a pre-discovery, pleadings-stage dispositive motion. Thus, the Court finds that it should not use evidence produced during discovery to reconsider an order on a pleadings-stage dispositive motion.

in reaching its decision on the pre-discovery dispositive motion.[32] Accordingly, the Court finds that it should not use this evidence to reconsider its order, and the Motion for Reconsideration is thus due to be denied.

### C.   Plaintiff's Motion for Leave to Supplement the Record and the Crowe Defendants' Motion to Strike

On February 18, 2022, Plaintiff moved for leave to supplement the record with evidence that Clayton had entered a guilty plea of aggravated assault with the intent to rape Plaintiff. Doc. No. [149]. The proposed evidence includes a hearing transcript from Clayton's criminal proceedings in state court, and Plaintiff argues that the testimony therein supports Plaintiff's theory that Clayton's parents had prior notice of his earlier sexual assaults. Id. at 1–4. Plaintiff contends that the Court should examine this evidence to aid its consideration of Plaintiff's Motion for Reconsideration. Id. at 4–5.

The Crowe Defendants responded by moving to strike Plaintiff's Motion for Leave to Supplement the Record. Doc. No. [151]. They alternatively labeled

---

[32]   Moreover, the Court has doubts about whether such evidence would have been considered both "central to plaintiff's claim" and "undisputed." See GoPlus Corp., 533 F. Supp. 3d at 1353–54 (determining that the court could not consider certain exhibits without converting a motion for judgment on the pleadings into one for summary judgment because, although the exhibits may have been relevant to factual allegations, they were not necessary for the survival of the plaintiff's claim).

their filing as a response in opposition to the motion. Id. at 1. The Court considers the filing as a response brief rather than as a motion to strike.[33] The Crowe Defendants argue that the Court should not permit Plaintiff to supplement the record because: (1) the filing of supplemental materials was procedurally improper; (2) the proposed evidence does not constitute the type of "discovery materials" that are allowed to be filed to supplement the record because the discovery period had closed by the time Plaintiff filed her motion; (3) the evidence is "irrelevant" and Plaintiff improperly seeks to use it to relitigate prior arguments; and (4) the motion is time barred. Id. at 4–9.

The Motion to Supplement is due to be denied. This evidence surfaced after the discovery period closed, and thus well after the pleadings stage closed. If this evidence is intended to supplement Plaintiff's Motion for Reconsideration, then it is due to be denied for the same reasons her Motion for Reconsideration is due to be denied. Also, the Motion to Supplement seeks to supplement the

---

[33] A motion to strike is procedurally improper here because a court may strike only "from a pleading." Fed. R. Civ. P. 12(f). Because Plaintiff's motion is not a pleading under Federal Rule of Civil Procedure 7(a), this Court is not authorized to strike it. See Chavez v. Credit Nation Auto Sales, Inc., 966 F. Supp. 2d 1335, 1344 (N.D. Ga. 2013); Acquired Cap. I, L.P. v. Chattahoochee Mortg. & Invs. Corp., No. 3:10-CV-17-TCB, 2011 WL 13230345, at *2 (N.D. Ga. June 22, 2011).

record to support a claim that the Court has determined to be time barred. The

Motion to Strike, aside from being procedurally improper as noted above, is thus

moot. As a result, the Court finds that both motions are due to be denied.

## IV.   CONCLUSION

For the reasons discussed above, the Court **RULES** as follows: First, the

Court **GRANTS** the Barrow Defendants' Motion for Summary Judgment (Doc.

No. [113]) and **DENIES** Plaintiff's related Motion for Leave to File Surreply (Doc.

No. [145]). Second, the Court **DENIES** Plaintiff's Motion for Reconsideration

(Doc. No. [127]) and related Motion for Oral Argument (Doc. No. [128]). Finally,

the Court **DENIES** Plaintiff's Motion for Leave to Supplement the Record (Doc.

No. [149]) and the Crowe Defendants' related Motion to Strike (Doc. No. [151]).

As no further issues remain outstanding for the Court's review, the Court

**DIRECTS** the Clerk to enter judgment in favor of Defendants and to **CLOSE this**

**case**.

**IT IS SO ORDERED** this 20th day of July, 2022.

/s/ Steve C. Jones
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

82